GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF PUBLIC SCHOOLS
OFFICE OF STUDENT HEARINGS

In the Matter of

A███████ H█████

                    Washington, D.C.

                    Friday, May 12, 2006

        The above-entitled matter came on
for hearing, pursuant to notice.

BEFORE:
            TONYA BUTLER-TRUESDALE,
            Hearing Officer


APPEARANCES:

        On Behalf of the Student/Parent:

            ANNA FORBES TOWNS, ESQ.

        On Behalf of D.C. Public Schools:

            KAREN J. HERBERT, ESQ.
            WILLIAM HOUSTON, ESQ.




        This transcript was produced from
an audio CD provided by D.C. Public Schools.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C. 20005-3701        www.nealrgross.com

2

```
                    I N D E X
Witnesses          Direct  Cross  Redirect
Recross
Paris Adon            21     41
Dr. David Cranford 49        65       73
Gregory L. Bush       76     82
Camille Howe          89    105
LaTanya Higginbotham 145 177


Voir Dire Examination:  p. 52
                  EXHIBITS
Exhibit No.                    Ident.   Rec'd
AH No.:
AH-01 through AH-05               11       11
DCPS No.:
DCPS-01 and 02                   12       12
Options No.:
1 through 20                     12       12
```

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1          P R O C E E D I N G S

2               HEARING OFFICER BUTLER-TRUESDALE:

3     Today is Friday, May 12th, 2006, and this is

4     an administrative due process hearing for

5     Ashley Howe, whose birth date is listed as

6     August the 15th, 1992.

7               This is an administrative hearing

8     which is being conducted in accordance with

9     the guidelines and regs. established by

10    Public Law 108-442 -- I'm sorry -- 446, the

11    Individuals with Disabilities Education

12    Improvement Act, reauthorized as the IDEIA

13    of 2004, the rules of the Board of Education

14    for the District of Columbia in Section 1.5

15    of the D.C. Appropriations Act.

16               I'm Tonya Butler-Truesdale, and

17    independent Hearing Officer.  As a Hearing

18    Officer, I'm not an employee of the District

19    of Columbia Public Schools, and I have no

20    relationship or close acquaintance with any

21    of the parties involved in this hearing.

22               I will hear the evidence

1    presented during this hearing and make a

2    ruling in accordance with the applicable

3    laws, rules, and regulations.

4            This hearing is closed to the

5    public unless the parent explicitly states

6    it should be open to the public.  The

7    matters discussed here today are

8    confidential and must remain confidential

9    even after the hearing has completed.

10            Either party may request a copy

11    of the tape or written transcript by writing

12    to the Student Hearing Office at 825 North

13    Capitol Street, N.E., Eighth Floor,

14    Washington, D.C. 20002.

15            I'd now like to request that each

16    person present introduce themselves for the

17    record starting with Ms. Herbert on my left.

18            See if it works this time.

19            MS. HERBERT:  Good morning, Ms.

20    Butler-Truesdale.  Karen Jones Herbert,

21    Attorney-Advisor, D.C. Public Schools.

22            MR. HOUSTON:  Good morning.  Bill

1    Houston, attorney for Options Public Charter

2    School.

3            HEARING OFFICER BUTLER-TRUESDALE:

4    I said that because yesterday I tried to

5    start.  I always start with DCPS counsel,

6    and your partner introduced himself first.

7            (Laughter.)

8            DR. CRANFORD:  David Cranford,

9    licensed psychologist, Options Public

10   Charter School.

11           MS. ADON:  I'm Paris Adon.  At

12   the time I was the Vice Principal at Options

13   Public Charter School.

14           MR. BUSH:  I'm Gregory Bush.  I'm

15   A███████ H█████ father.

16           MS. HIGGINBOTHAM:  Good morning.

17   LaTanya Higginbotham for Ashley Howe at the

18   public hearing.

19           MS. TOWNS:  Good morning.  Anna

20   Towns, attorney representing A██████ H████ and

21   the parents.

22           HEARING OFFICER BUTLER-TRUESDALE:

6

1    All right.  Has the parent -- I know we're

2    expecting the parent, right?

3                MS. HIGGINBOTHAM:  Yes.

4                HEARING OFFICER BUTLER-TRUESDALE:

5    Has he or -- well, we have one here.

6                MS. HIGGINBOTHAM:  Yes.

7                MR. HOUSTON:  But just to

8    clarify, Ms. Anna Forbes Towns said "for the

9    parents."  Is Mr. Bush your client also?

10                MS. TOWNS:  I will -- Mr. Bush is

11    my client as a parent of the student.

12    However, I am retained specifically by the

13    mother.

14                MR. HOUSTON:  Okay.  So you

15    misrepresented yourself just now when you

16    said "parents" --

17                MS. TOWNS:  Okay.

18                MR. HOUSTON:  -- because you

19    don't represent both parents, do you?

20                MS. TOWNS:  I represent A███████

21    H█████ and the parent, the mother.

22                MR. HOUSTON:  Thank you.

1            MS. TOWNS:  Sure.

2            HEARING OFFICER BUTLER-TRUESDALE:

3    Have both parents been advised of their due

4    process rights?

5            PARTICIPANT:  Yes.

6            MR. HOUSTON:  Mr. Bush, since

7    you're not represented, I believe you need

8    to speech on your own behalf.  I'm sorry.

9            HEARING OFFICER BUTLER-TRUESDALE:

10   Have you been advised of your due process

11   rights?

12           MR. BUSH:  As far as?

13           HEARING OFFICER BUTLER-TRUESDALE:

14   Okay.  Let me show you so that you will know

15   what I'm referring to.

16           Let the record reflect that I'm

17   handing him a copy of the due process

18   rights.

19           MR. BUSH:  Thank you.

20           HEARING OFFICER BUTLER-TRUESDALE:

21   Now, please don't be insulted.  I have to

22   ask the question because I gave it to you to

8

1    read.

2                    MR. BUSH:  Right.

3                    HEARING OFFICER BUTLER-TRUESDALE:

4    You are literate?  You can read?

5                    MR. BUSH:  Yes.

6                    HEARING OFFICER BUTLER-TRUESDALE:

7    Okay.

8                    MR. BUSH:  Before you go any

9    further --

10                    HEARING OFFICER BUTLER-TRUESDALE:

11   Yes, sir.

12                    MR. BUSH:  -- at 9:50 can I go

13   put some money in the meter?

14                    HEARING OFFICER BUTLER-TRUESDALE:

15   I understand.

16                    MR. BUSH:  I'll come back after.

17                    HEARING OFFICER BUTLER-TRUESDALE:

18   Okay.  Thank you for telling me.

19                    Okay.  So we do know that at

20   least the parent present has been advised of

21   his due process rights, and Ms. Towns has

22   informed me that her client, the mother, has

1    also been informed of her due process

2    rights.

3                 Okay.  Are we waiving a formal

4    reading of those rights?

5                 MS. TOWNS:  We are waiving the

6    formal reading of the due process rights for

7    the mother.

8                 HEARING OFFICER BUTLER-TRUESDALE:

9    Okay, and are you waiving the formal reading

10   of them?

11                MR. BUSH:  Yes.

12                HEARING OFFICER BUTLER-TRUESDALE:

13   Excellent.  All right.  Now, I have, in

14   terms of disclosures, Parents' Disclosures

15   AH-01 through AH-08.

16                MR. HOUSTON:  I object to three

17   of the documents in there, AH-05, request

18   for records, dated 3/29/06.  The hearing

19   request notice was 3/13/06.  The request for

20   records is not germane to this matter, and

21   it's after the date of the hearing request.

22                And the report card under AH-06

10

1  for school year '04-'05, that's a school

2  report from the community academy and is not

3  germane to the hearing request.

4              HEARING OFFICER BUTLER-TRUESDALE:

5  Which number is that?

6              MR. HOUSTON:  AH-06, the report

7  card school year '04-'05.  She included both

8  school years.

9              And AH-07, the Stanford 9, dated

10  4/05, which was administered at the

11  Community Academy and is not germane to this

12  hearing.

13              HEARING OFFICER BUTLER-TRUESDALE:

14  Ms. Towns?

15              MS. TOWNS:  No objections to

16  counsel's objection to those records.

17              HEARING OFFICER BUTLER-TRUESDALE:

18  Okay.  In other words, you're not opposing

19  his objection --

20              MS. TOWNS:  No.

21              HEARING OFFICER BUTLER-TRUESDALE:

22    -- to the exclusion?

1             MS. TOWNS:  Not at all.

2             HEARING OFFICER BUTLER-TRUESDALE:

3   Of five, six and seven?

4             And this is the attendance sheet.

5   Also sign the attendance sheet.

6             MS. TOWNS:  I'm sorry.  I'll need

7   just a minute to speak with --

8             HEARING OFFICER BUTLER-TRUESDALE:

9   Sure.  That's no problem.

10            We're going off the record.

11            (Whereupon, a short recess was

12   taken.)

13            HEARING OFFICER BUTLER-TRUESDALE:

14   Back on the record.

15            Just in terms of keeping the

16   record consistent with the disclosures, I

17   wanted to make sure that I noted for the

18   record that parents' disclosures have now

19   changed from AH-01 to AH-05.  So we tabbed

20   your last disclosure, which was Number 8 and

21   made that Number 5.

22             MS. TOWNS:  Oh, okay.

12

1              (Whereupon, the

2              documents referred to

3              were marked as Howe

4              Exhibit Nos. AH-01

5              through AH-05 for

6              identi-fication and were

7              received in evidence.)

8         HEARING OFFICER BUTLER-TRUESDALE:

9    All right.  Any objections to DCPS-01

10   through DCPS-02?

11        MS. TOWNS:  No objection.

12              (Whereupon, the

13              documents referred to

14              were marked as DCPS

15              Exhibit Nos. DCPS-01

16              through 02 for identifi-

17              cation and were received

18              in evidence.)

19        HEARING OFFICER BUTLER-TRUESDALE:

20   And OPC -- it's Options, right?

21        PARTICIPANT:  Yes, ma'am.

22        HEARING OFFICER BUTLER-TRUESDALE:

1    Oh, one through 20.  No objections?

2              MS. TOWNS:  No objections.

3                        (Whereupon, the

4                        documents referred to

5                        were marked was Options

6                        Exhibit Nos. 1 through

7                        20 for identifica-tion

8                        and were received in

9                        evidence.)

10             HEARING OFFICER BUTLER-TRUESDALE:

11   All right.  I'm ready for your opening

12   statement, Ms. Town.

13             MS. HERBERT:  If I could, a

14   preliminary matter --

15             HEARING OFFICER BUTLER-TRUESDALE:

16   Oh, sure.

17             MS. HERBERT:  -- Madam Hearing

18   Officer.  I believe that D.C. Public Schools

19   is in here basically as the LEA or SEA

20   because they have their own -- Option has

21   its own attorney, and I don't see anything

22   that D.C. Public Schools has to do with this

14

1    case.  There's not a question of placement,

2    for us to place the child, and that would be

3    the only reason we would be here.  So I

4    would respectfully request that DCPS be

5    dismissed from this particular case.

6               HEARING OFFICER BUTLER-TRUESDALE:

7    Ms. Towns, do you have an objection?

8               MS. TOWNS:  No objections.

9               HEARING OFFICER BUTLER-TRUESDALE:

10    Mr. Houston?

11               MR. HOUSTON:  I have no

12    objections.

13               HEARING OFFICER BUTLER-TRUESDALE:

14    Okay.  Thank you very much.

15               MS. HERBERT:  Thank you.

16               HEARING OFFICER BUTLER-TRUESDALE:

17    Bye-bye.

18               Do you have an opening statement,

19    Ms. Towns?

20               *MS. TOWNS:  The hearing here

21    today is concerning student A███ H███, who

22    is a seventh grade student at Options Public

15

1    Charter School.  A▓▓▓▓▓ enrolled at Options

2    in September?

3              PARTICIPANT:  Yes.

4              MS. TOWNS:  In September of '05.

5    At the time of her enrollment, the parent

6    requested that she be evaluated based on her

7    lack of performance and other issues that

8    the parent was concerned about.

9              Parent will testify that she

10   asked or requested evaluations on a number

11   of occasions and was told that arrangements

12   would be made for --

13             MR. HOUSTON:  With your

14   indulgence.

15             MS. TOWNS:  -- for that testing.

16             MR. HOUSTON:  Madam Hearing

17   Officer, when she says "parent," can she

18   refer to either the mother or the father?

19   Because the father is not a party to this.

20   He is a witness, and when she says "parent"

21   the record needs to show that it's the

22   mother who's doing all of this.

16

1            MS. TOWNS:  Yes.  The mother or

2    surely.

3            The mother will testify that she

4    requested on a number of occasions that

5    A██████ be evaluated in all areas of

6    suspected disability; that she was told on a

7    number of occasions that this would happen.

8            We're here today based on

9    Option's failure to evaluate A██████ in all

10   areas of suspected disability.  A██████ is a

11   student who is in need of specialized

12   services and possibly full-time services,

13   but at this time, we are contending that

14   that decision has been made prematurely

15   based on Option's failure to evaluate her in

16   all areas of suspected disability.

17           Options did conduct a psycho-

18   educational evaluation on the dates 10/27,

19   11/3, and 11/14/05, and as a result of that,

20   they convened an MDT IAP meeting and

21   determined that she needed full-time special

22   education services.

17

1             HEARING OFFICER BUTLER-TRUESDALE:

2    I'm sorry.  I need to stop you just for the

3    purpose of my notes.  You said she was

4    evaluated psycho-educational?

5             MS. TOWNS:  The psycho-

6    educational evaluation had three dates:

7    10/27?05, 11/3/05, and 11/14/04.

8             HEARING OFFICER BUTLER-TRUESDALE:

9    Okay.  Thank you.

10            MS. TOWNS:  Based on that

11    evaluation the IAP MDT team was convened and

12    determined that A████ did, in fact, need

13    full-time special education services.

14        We're here today because the

15    mother is contending that Options failed to

16    evaluate A████ in the broad range of areas

17    of her suspected disability, and we would

18    like to move to placement, but at this

19    meeting we are asking that the Hearing

20    Officer finds that Options failed to

21    evaluate A████ in all areas of suspected

22    disability, and that we would need to have

1    those evaluations ordered so that we can

2    move to determining appropriate placement.

3              HEARING OFFICER BUTLER-TRUESDALE:

4    What other evaluations are you talking

5    about?

6              MS. TOWNS:  The evaluations that

7    we are requesting are the speech-language

8    evaluation, clinical evaluation,

9    occupational therapy assessment based on the

10   psycho-ed, a social history, FBA and BIT and

11   vision and hearing screens.

12             We would ask that after these

13   evaluations are conducted that Options would

14   convene an MDT IAP placement meeting and

15   determined -- review each evaluation,

16   determine an appropriate IAP for Ashley and

17   placement.

18             HEARING OFFICER BUTLER-TRUESDALE:

19   Mr. Houston.

20             MR. HOUSTON:  Yes, ma'am.

21   Options Public Charter School, once A▇▇▇

22   was enrolled at the school, initiated a SIT

19

1   referral because they found that the child

2   was not progressing as they suspected.  So

3   they convened a meeting on the 18th of

4   October to talk with the mother regarding

5   evaluations.

6             At that meeting, they concluded

7   that they needed to do an initial

8   evaluation, and Dr. Cranford, a licensed

9   clinical psychologist, did a psycho-

10  educational.  In that psycho-educational, he

11  did some projected testing and found that

12  there was no need  for further clinical

13  evaluations because he is a licensed

14  clinical psychologist.

15            He did do a battery of

16  educational testing.  He did a clinical

17  interview.  He did a behavioral observation.

18  He did a visual-motor integration test at

19  Buck Teneka (phonetic), and a Conors rating.

20            So he did a full battery of

21  tests.  then Options tried to hold a meeting

22  on December 14th.  The parent was not

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

20

1    available.  So Options then met again on the

2    12th, where at that meeting the team

3    concluded that based upon the evaluations

4    and the team members  that A█████ --

5              HEARING OFFICER BUTLER-TRUESDALE:

6    You said they tried to convene a meeting on

7    December the 14th, and then you said the

8    12th.  The 12th of what, January?

9              MR. HOUSTON:  I'm sorry.  The

10   12th of January.  They finally were able to

11   get the mother in to a meeting and concluded

12   that A█████ needed a full-time program.Well,

13   both of the parents were there, Mr. Bush and

14   Ms. Howe.  A████████ mother and father were

15   both present at that January 12th meeting,

16   and at that meeting they concluded that

17   A█████ is learning disabled and she needs to

18   be in a self-contained program, in a full-

19   time program.

20              They re-met on the 26th of

21   January to go over the individualized

22   education program that Options had drafted,

21

1   and the entire team was in agreement with

2   the IAP and the father, Mr. Gregory Bush,

3   signed the IAP for a full-time IAP.

4           HEARING OFFICER BUTLER-TRUESDALE:

5   Now, what date was that again?

6           MR. HOUSTON:   That was January

7   26th, 2006.

8           Thinking that the meeting was

9   over, Mr. Bush left, at which point Ms. Howe

10  raised objections to the full-time IAP.  She

11  raised objections that she didn't want her

12  child in a full-time placement.  She raised

13  objections that she didn't want A▆▆▆▆ to

14  know that she was in special education and

15  that she did not want to be segregated from

16  the general populous in a self-contained

17  program that Options has.

18          So Ms. Adon and the remaining

19  members of the team reduced the number of

20  hours to meet the mother's request even

21  though the father had already left, and the

22  father was the one that signed the IAP.

22

1          Ms. Adon then, after the IAP team

2    had left, worked with Ms. Howe on what the

3    schedule for A███████ would be in accordance

4    with the revised IAP, and then shortly

5    after, the mother filed suit saying that,

6    among other things, that the IAP team was

7    illegally constituted, that Options reduced

8    the number of hours, and apparently because

9    Ms. Anna Forbes Towns didn't mention that as

10   part of her issues, the only issue that she

11   raised in her opening was the failure to

12   test properly.

13          There were four other issues, and

14   I'm wondering or I'm assuming then that she

15   is no longer presenting those four other

16   issues that she has in her NRG process

17   hearing complaint.

18          MS. TOWNS:  Are we able to read

19   those separate --

20          MR. HOUSTON:  Yes.  Whether this

21   student was denied faith due to the failure

22   of DCPS and/or options to provide her with

1   an educational program consistent with her

2   current IAP, they have been providing A██████

3   with the IAP goals from the reduced number

4   of hours that Ms. Howe had requested.

5             Whether this student was denied

6   faith due to the failure of DCPS and/or

7   Options PCS to convene a legally constituted

8   IAP team meeting to make the eligibility

9   determination determine the appropriate

10  disability code and develop and appropriate

11  IAP and educational program for the student.

12            The record will show that the

13  member that were there, the IAP meeting and

14  the eligibility meeting, were legally

15  constituted.  Whether this student was

16  denied faith due to Options changing the

17  number of service hours on the IAP without

18  the participation of the parent or the IAP

19  team, that is just patently untrue.

20            The mother was there and so was

21  the rest of the team.  The father was not

22  there.  Whether this student is entitled to

24

1    an award of compensatory education due to

2    lost services based upon violations

3    regarding the student's IAP and services

4    and/or placement, there is nothing in the

5    record that shows that she's lost any

6    education based upon.  Besides, we have been

7    providing the IAP consistent with what the

8    mother's wishes were.

9            Now, if this was a lawsuit filed

10   by Mr Bush, those issues may be germane

11   because he is the aggrieved party here, not

12   the mother.  The mother is the one that

13   requested the reduced hours, and she got

14   them because she did not want A███████to be

15   segregated from the general population, and

16   she did not want A███████to know that she was

17   a special needs child.

18            So in an effort to accommodate

19   the mother, Options Public Charter School

20   reduced the number of hours provided her

21   with the class schedules and then she

22   rewards options for doing that by taking us

1    to the lawsuit.  So we request that all

2    these issues be dismissed and that these

3    issues are frivolous, and we're requesting

4    attorney's fees be paid to Options Public

5    Charter School.

6                    HEARING OFFICER BUTLER-TRUESDALE:

7    Let me take the last issue first.  Is there

8    anything in the IDEIA that gives me the

9    authority to award you attorney's fees?

10                   MR. HOUSTON:  Yes, ma'am.  Under

11   the new law, when a suit is frivolous, the

12   respondents can be awarded attorney's fees.

13                   HEARING OFFICER BUTLER-TRUESDALE:

14   Do you have the --

15                   PARTICIPANT:  Yes.

16                   HEARING OFFICER BUTLER-TRUESDALE:

17   And while you're getting that, I'm so sorry.

18   I have to apologize.  I came in the room

19   without my glasses, which is why I was

20   asking you to read that.

21                   So let me run get my glasses and

22   I'll be right back.

26

1          MR. HOUSTON:  Yes, ma'am.

2          (Whereupon, a short recess was

3    taken.)

4          HEARING OFFICER BUTLER-TRUESDALE:

5    Okay.  Thank you.

6          MR. HOUSTON:  The cite under the

7    proposed rules of June 21st, 2005, is 34 CFR

8    300.517(a)(ii) -- little I.

9          HEARING OFFICER BUTLER-TRUESDALE:

10   Let's read that.

11         MR. HOUSTON:  Yes, the area that

12   I've blocked off.

13         HEARING OFFICER BUTLER-TRUESDALE:

14   Okay.  "Attorney's fees.  The prevailing

15   party" -- I'm sorry.  Two, small I, "to a

16   prevailing party who is an SEA or LEA

17   against the attorney of a parent who files a

18   complaint or subsequent calls of action that

19   is frivolous, unreasonable, without

20   foundation, or against the attorney of a

21   parent who continues to litigate after

22   litigation clearly became frivolous,

1   unreasonable or without foundation."

2              Thank you very much.

3              MR. HOUSTON:  Yes, Your Honor.

4   And one last part I forgot to mention.

5   There was a resolution meeting on this on

6   March 27th, 2006, where the parents could

7   not agree to what to do on the IAP.  Mr.

8   Bush and Ms. Howe were at odds about what

9   was in the best interest of this child.

10             It is difficult for Options to

11  proceed with this child when you have two

12  parents with diametrically opposed views on

13  what we need to do with this child.  They

14  could not agree at the resolution meeting,

15  and that's what precipitated this whole

16  thing, because Mother did not agree with the

17  father's decision.

18             HEARING OFFICER BUTLER-TRUESDALE:

19  Okay.  Who is your first witness?

20             MR. HOUSTON:  Did you want us to

21  go first?

22             HEARING OFFICER BUTLER-TRUESDALE:

28

1    Yes.

2                    MR. HOUSTON:  Okay.  Thank you.

3                    I'd like to call Mr. Adon as a

4    witness.

5                    HEARING OFFICER BUTLER-TRUESDALE:

6    Would you raise your right hand, please?

7    Whereupon,

8                         PARIS ADON

9    was called as a witness by counsel for the

10   DCPS and, having been first duly sworn, was

11   examined and testified as follows:

12                   HEARING OFFICER BUTLER-TRUESDALE:

13   Okay.  Can you bring that mic a little

14   closer to you?  There we go.  Yes, thank

15   you.

16                   THE WITNESS:  Okay.

17                   HEARING OFFICER BUTLER-TRUESDALE:

18   Spell your name for the record, please.

19                   THE WITNESS:  Paris, P-a-r-i-s,

20   is my first name.  Adon, A-d-o-n, is my last

21   name.

22                   HEARING OFFICER BUTLER-TRUESDALE:

29

1    Thank you.

2                    DIRECT EXAMINATION

3                BY MR. HOUSTON:

4        Q    Mr. Adon, can you tell us your

5    educational background?

6        A    I have a Bachelor's degree in

7    special ed. and a Master's degree in school

8    administration, and I'm certified in special

9    ed. in three states and certified as a

10   principal in two states.

11       Q    Okay, and during the time of this

12   litigation, what was your role -- were you

13   employed at Options Public Charter School?

14       A    Yes, at the time I was the Vice

15   Principal, slash, special ed. coordinator.

16       Q    Okay.  Do you know A███████ H██████

17       A    Yes.

18       Q    And how did you get to know her?

19       A    Well, I received -- when the mom

20   tried to enroll her at the time, I did not

21   meet A███████ but I met her the first day of

22   school.

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1          Q      Okay.

2          A      Because I knew who she was

3    because of the mother had requested for

4    evaluation for that time.

5          Q      Okay, and did you subsequently

6    have a SIT meeting?

7          A      Yes.

8          Q      And what was the conclusion of

9    that SIT meeting?

10                Oh, could you tell us what the

11   SIT is?

12         A      The SIT is the school

13   instructional team, S-I-T, and basically

14   it's a team that sits together to see what

15   we can do before evaluations are done or,

16   you know, to see if there are any other

17   strategies that we can implement in the

18   classroom to make the child successful.

19                But at that time, during that

20   meeting, since the parent had requested the

21   testing, we had agreed to do a psycho-ed.,

22   and the team was in agreeance (phonetic)

1    that the student needed a psycho-ed.

2    evaluation.

3         Q    Okay, and did the school do the

4    psycho-educational?

5         A    Yes, yes.

6         Q    And was there  a subsequent

7    meeting to discuss that psycho-educational?

8         A    Yes.

9         Q    And when was the first attempt to

10   meet?

11        A    We did a meeting in October.

12   There was a lot of scheduling conflicts.  I

13   don't know specifically, but I'm sure it's

14   in there.

15        Q    Okay.  If you look at Document

16   Number -- Options OPCS No. 15.

17        A    Okay.

18        Q    Does that refresh your memory?

19        A    Yes.  December 14th.

20        Q    Okay, and what was that?

21        A    That was a meeting to -- all

22   right.  That was the meeting to start the

32

1    special ed. services, but there was no

2    parent.  So we didn't have permission to

3    start the services without parental consent.

4         Q    And did you reschedule that

5    meeting?

6         A    Yes.

7         Q    And when did you reschedule that

8    eligibility meeting for?

9         A    I think it was in January,

10    January 12th, if I'm not mistaken.  Yes.

11        Q    Can you look at Document OPCS No.

12    12?  I'm sorry.  OPCS No. 14.

13        A    Okay.

14        Q    I apologize.

15        A    Yes, the 12th.

16        Q    Okay.  Now, what is that?  Can

17    you identify that document?

18        A    Yes.  That's the meeting notes

19    from the 12th to determine eligibility for

20    Ashley.

21        Q    Okay,a nd were you present at

22    that meeting?

33

1          A    Yes.  Yes, I was.

2          Q    And do you recall the discussion

3     of that, what the discussion of that meeting

4     was?

5          A    Yes.  Dr. Cranford reviewed the

6     evaluation, and we all agreed that A███████

7     needed a self-contained classroom, which

8     Options could provide at the time.

9          Q    Okay.  So that's a full-time

10    special education --

11         A    Yes, a full-time special ed.

12    program.

13         Q    Okay.  Was there any objections

14    to that at that meeting?

15         A    No.

16         Q    Okay.  Now, did you draft the IAP

17    at that meeting?

18         A    Yes.  I did -- no, not at that

19    meeting.

20         Q    Okay.

21         A    I drafted it after that meeting.

22    I did a draft and then we re-met on the 26th

34

1    at one.

2        Q    Okay.

3        A    To get consent.

4        Q    And can you look at OPCS No. 13?

5        A    Un-huh.

6        Q    Can you identify that document?

7        A    Yes, that is the IAP.

8        Q    Okay, and when you presented this

9    to the team, did everybody agree with this

10   document?

11       A    Yes.

12       Q    And did a parent sign this

13   document?

14       A    Yes.

15       Q    And who was that parent that

16   signed it?

17       A    Mr. Bush.

18       Q    And did he sign that he agreed

19   with the document or with the IAP?

20       A    Yes.

21       Q    All right.  Now, after that was

22   signed, was there a time when Mr. Bush left?

35

1        A     Yes.  See, I didn't sit in on the

2   original with Mr. Bush.

3        Q     Okay.

4        A     Dr. Cranford was at that meeting,

5   and I received a phone call on my cell phone

6   saying that the mother had arrived at the

7   school and I needed to come back to the

8   school.

9        Q     Okay.  So then the mother and the

10  rest of the team --

11       A     Right.

12       Q     -- met without Mr. Bush.

13       A     Yes, that's correct.

14       Q     And what were her concerns?

15       A     Is that she didn't want to A█████

16  to be in a full-time self-contained

17  classroom and she didn't want A█████ to know

18  that she was special ed.

19       Q     Okay.  Did she say why?

20       A     She said because A█████ is not

21  going to like it.

22       Q     Okay.  Did at any time the parent

1       or the mother or either parent say that she

2       needs to be further tested?

3               A       No.

4               Q       Did either parent at any time

5       disagree with the testing that Dr. Cranford

6       did?

7               A       No.

8               Q       Okay.  So when the mother then

9       asked you to go over the IAP, did you?

10              A       Yes.

11              Q       And what occurred because of that

12      meeting?

13              A       Well, we went over the IAP, and

14      we sat there for at least a good three

15      hours, and I came to a resolution with the

16      mother to create this special schedule for

17      Ashley, and which I did.          .

18              Q       And what was that special

19      schedule?

20              A       She was the only child at Options

21      where we did this for.  We created a special

22      schedule for her to go to the self-contained

1    classroom some times and then for her to go

2    to a co-teaching classroom where it was a

3    special ed. teacher and a regular ed.

4    teacher part of the day.

5        Q    Would that be Document OPCS No.

6    12?

7        A    Yes.

8        Q    Okay. All right. So --

9        A    And we revised this several

10   times. This is just the original one, and

11   we -- I got calls from Ms. Howe saying she

12   wanted the schedule changed. So I bent over

13   backwards to change the schedule several

14   times for Ms. Howe.

15       Q    Okay. So you had an initial

16   eligibility meeting. Ms. Howe or Mr. Bush

17   did not object to the evaluations.

18       A    No.

19       Q    Neither one of them objected to

20   the full-time placement.

21       A    Huh-un.

22       Q    At the January 26th meeting,

38

1    neither one of them objected to or Mr. Bush

2    didn't object to the full-time placement.

3           A    No.

4           Q    It was only after that meeting

5    had ended --

6           A    Right.

7           Q    -- that Ms. Howe objected to the

8    IAP.

9           A    Right.

10          Q    Okay.  Now, if you could look

11   back on Number 13, under the total services.

12          A    Right.

13          Q    Do you see the X marks on there?

14          A    Yes.

15          Q    Is that X marks that you put in

16   there?

17          A    Yes.

18          Q    That was subsequent to Mr. Bush

19   departing?

20          A    Right.

21          Q    Which was then reduced to 15 and

22   a half --

39

1        A    Fifteen, right.

2        Q    -- hours.

3        A    Right.

4        Q    Would that place A████ in a

5    full-time self-contained program?

6        A    No.

7        Q    Okay.  Were you -- did you attend

8    the March 27th resolution meeting?

9        A    I believe so.  I believe I

10    scheduled it.

11        Q    All right, and if you look at

12    OPCS No. 5 --

13        A    Okay.

14        Q    -- can you identify that

15    document?

16        A    Yes.

17            HEARING OFFICER BUTLER-TRUESDALE:

18    Before you go any further --

19            MR. HOUSTON:  Yes, ma'am.

20            HEARING OFFICER BUTLER-TRUESDALE:

21    -- can I ask that just for my

22    clarification is there anyone who can tell

40

1    me what this --

2                    MR. HOUSTON: Yes, ma'am. That's

3    a phone number of Mr. Adon.

4                    THE WITNESS: Oh, yes. Dr.

5    Cranford just wrote to contact me at the

6    bottom.

7                    HEARING OFFICER BUTLER-TRUESDALE:

8    And for the record, I was pointing to an

9    area on the Xerox of OPCS 13 that is cut

10   off, and all I could see was Mr. Adon, and I

11   couldn't see what else was --

12                   MR. HOUSTON: Yes, ma'am. If

13   you'd like to look at it, I'll show opposing

14   counsel.

15                   HEARING OFFICER BUTLER-TRUESDALE:

16   Okay.

17                   MR. HOUSTON: But that's what is.

18                   HEARING OFFICER BUTLER-TRUESDALE:

19   Thank you. Yes.

20                   Okay. I'm sorry. Go ahead.

21                   MR. HOUSTON: Yes, ma'am.

22                   BY MR. HOUSTON:

41

1        Q        Number 5.

2        A        Yes.

3        Q        Can you identify that document?

4        A        Yes.  The meeting notes from

5    March 27th.

6        Q        And what was the March 27th

7    meeting?

8        A        That was a resolution meeting.

9        Q        Okay, and were both parents, Mr.

10   Bush and Mr. Howe, there?

11       A        Yes.

12       Q        Ms. Howe.  And it looks as if

13   A▬▬▬ was there also.

14       A        Yes.

15       Q        Is that correct?

16       A        Yes.

17       Q        What was the outcome of that

18   meeting?

19       A        Well, there was no outcome.  The

20   parents didn't agree at the meeting.  They

21   didn't agree on the IAP.  The father agreed

22   that she needed to be in the full-time.  The

42

1    mother didn't want A███████in the full time.

2    The school was in a Catch-22.  It was like

3    what do we do here.

4              The school believed that she

5    needs to be in the full-time setting, which

6    Options could provide at the time, but to

7    the mother's objections, we took her out.

8    So there was no real -- it was -- it was

9    still at a standstill.  We were stuck in the

10   middle between two parents who were

11   disagreeing about the services that needed

12   to be provided.

13        Q    Okay.  Is Option ready to provide

14   a full-time or maybe you can't answer this.

15   Are you still employed at Options?

16        A    No, I'm not.

17        Q    Okay.  At the time of this

18   meeting, March 27th resolution meeting,  was

19   Options ready to implement a full-time IAP?

20        A    Yes.

21        Q    Did you offer that to the

22   parents?

43

1          A    Yes.

2               MR. HOUSTON:  Okay.  Thank you.

3               I have no further questions for

4    Mr. Adon at this point.

5               HEARING OFFICER BUTLER-TRUESDALE:

6    Cross.

7                    CROSS EXAMINATION

8               BY MS. TOWNS:

9          Q    Mr. Adon.

10         A    Yes.

11         Q    I'm Anna Towns, attorney

12   representing the mother and A█████

13              You indicated that early in the

14   school year that you convened a meeting.  I

15   don't have the specific date.

16         A    The SIT meeting.

17         Q    The SIT meeting.

18         A    Un-huh.

19         Q    To discuss the parent's request

20   for evaluations.

21         A    Un-huh.

22         Q    Okay.  At that time, can you tell

44

1  us what was the basis of your concern in

2  terms of A███████ need or the parent's

3  concern for evaluations?

4      A    She was saying that A██████ had

5  been failed in the past before she came to

6  Options, and her teacher also gave me a

7  printout of A███████ grades through the

8  month of September.

9      Q    Okay.

10     A    And she was failing from Ms.

11 Griser's (phonetic) class, and I did get a

12 referral from Ms. Griser as well.

13     Q    Okay.

14     A    And we did some informal -- I did

15 some informal observations throughout the

16 month of September to see A██████ and we had

17 a legitimate concern.

18     Q    Okay.  Mr. Adon, do you

19 understand that in terms of IDEIA when a

20 parent asks for initial evaluations that

21 though the parent may not frame it in that

22 manner, that what is understood is that the

45

1    parent would like some help in terms of

2    really evaluating her child completely and

3    knowing what is most appropriate for the

4    child?

5         A    Right, and we were going to do it

6    regardless of a SIT meeting.

7         Q    Okay.  All right.  Well, now, I'm

8    concerned.  Well, would you state how the

9    team came to it that the only evaluation

10   that A█████ needed was the psycho-ed.?

11        A    Well, because it was only an

12   educational concern.  There weren't any

13   behavior concerns at the time.  The month of

14   September A█████ was fine.  We didn't have

15   any -- there was no other speech problems.

16   I mean, we just determined that she needed

17   psycho-ed.

18        Q    Are you aware that IDEIA requires

19   that there's a full battery of valuations in

20   order to determine --

21             MR. HOUSTON:  I object.  That's --

22             BY MS. TOWNS:

1          Q     -- the appropriate --

2                MR. HOUSTON:  I object.  She's

3     interpreting what the law is and questioning

4     Mr. Adon if he knows the interpretation of

5     the law.

6                MS. TOWNS:  Fine.

7                THE WITNESS:  Correct.

8                BY MS. TOWNS:

9          Q     Mr. Adon, would you state did the

10    team consider any other evaluations that

11    needed to be done for A▄▄▄ at the time

12    inasmuch as this was an initial evaluation?

13         A     Yeah, we considered.

14         Q     What did you consider?

15         A     We spoke of all the evaluations

16    that Dr. Cranford -- well, Ms. Jarmon

17    (phonetic), I assume, was there, who was a

18    clinical therapist, and we just determined

19    that she needed psycho-ed. at the time.

20         Q     Okay, and then just based on that

21    one evaluation, the team was able to come to

22    a decision?

1          A      It wasn't based -- we didn't make

2     the decision based on just the evaluation.

3     We made a decision based on the team.

4          Q      On the team.  Okay.

5          A      Un-huh.

6          Q      Okay.  The team then met after

7     you had conducted the psycho-ed. to

8     determine --

9          A      Were about to private conduct.

10          Q      Yes.  -- to determine the

11     disability code, as well· as educational

12     programming that she would need.

13          A      Un-huh.

14          Q      At that meeting was there a

15     regular education teacher?  I would assume

16     that A███████had been attending regular

17     education classes.

18          A      Yes, there were several.  They

19     were in and out:  Ms. Griser, Mr. Davis, Mr.

20     Samuels.

21          Q      Okay.  Are you aware that the IAP

22     does not reflect in terms of the meeting

48

1    notes or the actual document that anyone was

2    there?

3         A    Right.

4         Q    Any of her regulator education

5    teachers were there in terms of being

6    involved in the decision regarding the

7    disability code or the services needed?

8         A    Yes.  They didn't sign because

9    they were frustrated.  So they left the

10   meeting.  They were in and out.  Ms. Griser

11   was available by phone.  Mr. Leonard was

12   there, and Mr. Samuels was there, but they

13   were frustrated because the meeting had went

14   on so long that they decided to leave.

15        Q    So that neither of them signed

16   the --

17        A    That is correct.

18        Q    -- IAP nor the meeting notes.

19        A    That's correct.

20        Q    Okay.  Now, so you did state that

21   it was your understanding at the beginning

22   of the year that the parent -- that the

1    mother asks for --

2         A    Let me clarify that.

3         Q    -- the evaluations to determine

4    her eligibility to receive special education

5    services.

6         A    She requested evaluations from

7    Options before she was a student at Options.

8         Q    Okay, okay.  Even before.

9         A    Right.  And we can't provide

10   assessments to a child who is not a student

11   there.

12        Q    Okay.

13        A    So, I mean, this was during the

14   enrollment process that she said she

15   requested evaluations, and she was not an

16   official student at that time.

17        Q    Okay, okay.

18        A    But I did tell her that we would

19   evaluate her, and which we did a month

20   later.

21        Q    Okay.  According to your

22   evaluation, was it determined that

50

1      additional evaluations were needed?

2          A      I think --

3                  MR. HOUSTON:  I object.

4                  THE WITNESS:  -- would be more

5      appropriate.

6                  MR. HOUSTON:  It wasn't his

7      evaluations.  It was Dr. Cranford, and Dr.

8      Cranford is here to talk about his

9      evaluations.

10                 THE WITNESS:  Right.

11                 BY MS. TOWNS:

12         Q      Okay.  So at --

13         A      I think he would be more

14     appropriate.

15         Q      Okay, fine.  At the eligibility

16     meeting, did you then -- did the team review

17     the psycho-ed.?

18         A      Yes.

19         Q      Did the team decide that

20     additional evaluations were needed?

21         A      No.

22                 MS. TOWNS:  Okay.  No further

51

1     questions.

2              MR. HOUSTON:   Thank you.  I have

3     nothing.

4              HEARING OFFICER BUTLER-TRUESDALE:

5     Okay.  Your next witness.

6              (The witness was excused.)

7              MR. HOUSTON:  Yes.  Dr. Cranford.

8              HEARING OFFICER BUTLER-TRUESDALE:

9     Would you raise your right hand, please?

10    Whereupon,

11              DR. DAVID CRANFORD

12    was called as a witness by counsel for the

13    DCPS and, having been first duly sworn, was

14    examined and testified as follows:

15              HEARING OFFICER BUTLER-TRUESDALE:

16    Thank you.

17              Your witness.

18              DIRECT EXAMINATION

19              BY MR. HOUSTON:

20         Q    Dr. Cranford, could you give us

21    your full name?

22         A    David Cranford.

1          Q     And could you give us your

2     educational background, please?

3          A     Ph.D., clinical psychology,

4     University of North Carolina, and also a

5     licensed psychology -- licensed psychologist

6     in D.C. and Virginia.

7          Q     Okay.  Have you worked for the

8     D.C. Public School System?

9          A     Yes.

10         Q     And what was your role with DCPS?

11         A     I was a psychologist, assistant

12    director, and also special ed. coordinator.

13         Q     Okay.  How long have you been a

14    licensed clinical psychologist?

15         A     I think it's five and a half

16    years now.

17         Q     Five and a half years, and have

18    you worked for a school system throughout

19    that time period?

20         A     Yes, the whole time period.

21         Q     And when did you start at Options

22    Public Charter School?

1          A     I started in August of 2003.

2                MR. HOUSTON:  Okay.  At this time

3     I'd like to qualify -- oh, I'm sorry.

4                BY MR. HOUSTON:

5          Q     Have you ever testified in

6     hearings before?

7          A     Yes.

8          Q     And have you been qualified as an

9     expert in those hearings?

10         A     Yes.

11               MR. HOUSTON:  At this time I'd

12    like to qualify Dr. Cranford as an expert in

13    the field of school psychology and clinical

14    psychology.

15               HEARING OFFICER BUTLER-TRUESDALE:

16    Any objection, Ms. Towns?

17               MS. TOWNS:  No objection.

18               BY MR. HOUSTON:

19         Q     Okay.  Do you know A███ H████

20         A     Yes, I do.

21         Q     And how did you get to know

22         A███

54

1          A     I evaluated her.

2          Q     Okay, and can you turn to

3     Document OPCS 16?

4          A     Okay.

5          Q     Okay.  Can you identify that?

6          A     That is the psycho-educational

7     evaluation that I conducted on A██████.

8          Q     Okay.  Now, when you did the

9     psycho-educational evaluations, did you

10    limit your evaluation to just her education?

11         A     No.

12         Q     Okay.  What types of test did you

13    perform?

14         A     Well, the referral question was

15    regarding her academic performance.  So

16    typically what I do is do a test of

17    intelligence which measures -- is supposed

18    to measure her academic potential; also a

19    test of achievement in her core academic

20    areas to see if she's working consistent

21    with her potential; also did a visual motor

22    screen to see if there's any problems

55

1    related to fine motor processing; and also

2    did a Conors rating scale, which looks at --

3    which can be used as a screen for any sort

4    of behavioral problems related to classroom

5    functioning.

6              But since the primary question

7    was regarding academics, that was the

8    primary focus of the evaluation.

9         Q    Did you do any clinical things

10   for Ashley in this?

11        A    A clinical interview and also the

12   Conors rating scales and also depending on

13   the referral question, the Wechsler

14   Intelligence Scale for Children can also be

15   used as a clinical measure.

16        Q    How about the behavior

17   observation?  Could that be considered a

18   clinical measure also?

19        A    Yes, yes, and any background

20   information from other adults working with

21   Ashley.  The difficulty with doing that at

22   times is that when a child is referred at

56

1    the beginning of a school year, when no one

2    has the opportunity to observe, it makes it

3    a little more difficult.

4         Q    Okay.  Let's stick to the

5    clinical side of it --

6         A    Okay.

7         Q    -- at first.  If you had seen any

8    indication that there may be some emotional

9    disturbances, would you have done a more

10   extensive clinical evaluation,f or instance,

11   do some more projected testing?

12        A    Yes.

13        Q    Did you at any time after you did

14   your behavior observation review the

15   records, the clinical interview, the Conors

16   and the Wechsler, feel that she needed

17   additional clinical testing?

18        A    No, not at that time.

19        Q    Okay.  So it's your professional

20   opinion that at the time of your testing and

21   at the time -- well, let me back up.

22             Did you have that same feeling on

1    January 12th, 2006 when there was an

2    eligibility meeting?

3        A    Yes.

4        Q    Okay.  The feeling that she did

5    not need further clinical testing to see if

6    she was emotionally disturbed?

7        A    No, not at that time.

8        Q    Okay.  All right.  The January

9    26th IAP meeting, did you feel that she

10   needed further clinical testing?

11       A    No.

12       Q    Okay.  So it's your professional

13   opinion that throughout this process that

14   A███████was not in need of any testing to see

15   if there were any emotional problems?

16       A    That's correct.

17       Q    Did you observe any emotional

18   behaviors whether it was in the classroom

19   observations or during testing?

20       A    No.

21       Q    Okay.  during the clinical

22   interview, did she give you any indication

58

1    that she may have some underlying emotional

2    problems?

3         A    Not that I recall.

4         Q    Okay.

5         A    Some frustration with academic

6    tasks.

7         Q    Okay.  Is that typical of a child

8    who has not been diagnosed with learning

9    disabilities in the past?

10        A    Yeah, from my experience,

11   especially learning disabilities that are

12   identified late in school, which I would

13   consider that to be the case with A████████

14   because of the frustration encountered in

15   the regular classroom.  Without services,

16   you know, other  things can emerge, a lot of

17   frustration with academic tasks and low

18   self-esteem.

19        Q    In your opinion, does that rise

20   to a level of an emotional disturbance?

21        A    No.

22        Q    Okay.  Now, when you did the

1    educational testing, did you find that she -

2    - well, tell us what you found from that

3    educational testing.

4         A    My conclusions were that she had

5    pretty substantial learning difficulties in

6    all of her core academic areas.

7         Q    Okay.

8         A    So what I was recommending was

9    that she get a specialized instruction, and

10   I'm just referencing my recommendations here

11   at the end.

12        Q    Could you tell us which page your

13   recommendations --

14        A    Yes.  that's on the last page,

15   page 9.

16        Q    Of Document No. 16?

17        A    Correct.  Based on my evaluation,

18   I thought that she had behaviors and

19   characteristics consistent with a learning

20   disability and because of the problems in

21   all of her academic areas, I thought that

22   she should have specialized instruction in a

1    small classroom focusing on all of the

2    academic areas, primarily math and written

3    language.

4              And the psychological counseling

5    services were recommended not only to deal

6    with the low self-concept regarding academic

7    weaknesses, but any other issues that might

8    emerge with being a learning disabled

9    student.  And also it's an opportunity for

10   the school to monitor whether there be any

11   other emerging behavior problems.

12        Q    Okay.

13        A    So those were the primary

14   recommendations.

15        Q    Did you take part in an

16   eligibility meeting on January 12th, 2006?

17        A    Yes, I believe I did.

18        Q    And at that meeting, did you

19   discuss the findings of your evaluations?

20        A    Yes.

21        Q    And were there any dissent to the

22   evaluation from any of the team members?

61

1          A     No.

2          Q     And did you then participate in

3     an IAP meeting on the 26th of January?

4          A     Yes.

5          Q     Okay.  At that -- oh, I'm sorry.

6     If you go back on the 12th of January, what

7     was the recommendation of the team for the

8     type of services for A▇▇▇▇▇▇▇?

9          A     Full-time services?

10         Q     Okay.  Was there any objection to

11    that at that meeting?

12         A     No.

13         Q     Was the mother there --

14         A     No.

15         Q     -- if you recall?

16         A     No.  I think the father was

17    there.  Mom came toward the end.

18         Q     Okay.  Can you look at Document

19    No. 14?

20         A     Un-huh.

21         Q     Do you see the mother's signature

22    on that?

62

1        A    Yes.

2        Q    Okay.  Do you recall if she

3    raised any objections at that meeting?

4        A    No.

5        Q    Okay.

6             HEARING OFFICER BUTLER-TRUESDALE:

7    No, you don't recall or, no, she raised no

8    objections?

9             THE WITNESS:  No, I don't recall

10   because I -- yeah, I don't recall.

11            HEARING OFFICER BUTLER-TRUESDALE:

12   Okay.

13            BY MR. HOUSTON:

14       Q    Well, to your recollection was

15   there any objections raised at that meeting?

16       A    Not that I recall.

17       Q    Okay.  Then on the 26th, there's

18   an IAP meeting, which is Document No. 13.

19   Were you at that meeting?

20       A    Yes.  Actually I started the

21   meeting.

22       Q    Okay.  Now, there's only four

63

1     names on here that's signed.  Were there

2     other members of that IAP team?  Do you

3     recall?

4          A     You know, I don't remember.  I

5     think we started out with I think Ms.

6     Skrizer (phonetic) was there and also Mr.

7     Samuels.

8          Q     Okay.

9          A     To be the regular ITs in addition

10    to the names listed.

11         Q     Okay.  Now, when you went through

12    the IAP, were there any objections to the

13    level of services or to the IAP, the goals

14    and objectives?

15         A     No.

16         Q     Okay.  Do you recall if a parent

17    signed the IAP?

18         A     Yes, Mr. Bush.

19         Q     Okay.  And can you tell us what

20    the original number of hours of specialized

21    instruction that the school proposed?

22         A     Twenty-four hours per week.

1          Q     Okay, and was there also

2     counseling that was proposed?

3          A     Yes.

4          Q     Okay.

5          A     A half hour per week.

6          Q     All right, a nd that would have

7     made a total of 24 and a half; is that

8     correct?

9          A     Correct.

10         Q     There is no objections to that.

11         A     No.

12         Q     Okay.  Were you a participant in

13    the March 27th, 2006 resolution meeting?

14         A     Yes.

15         Q     And that's Document OPCS No. 5.

16    Do you recall if the parents were at that

17    meeting?

18         A     Yes, they were.

19         Q     Okay.  Did the parents agree to

20    the number of hours and the services that

21    Options was willing to provide?

22         A     No, they disagreed.

1          Q     Okay.  Were you aware that Ms.

2     Howe did not want A███████ to k now that

3     A███████ is a special needs child?

4          A     Yes.

5          Q     Okay.  How did she communicate

6     that to you or to the school about that she

7     did not want A███████ to know about her

8     special needs status?

9          A     I'm not sure.  I think I can't

10    recall which particular meeting it was, but

11    I know that she had some concerns about

12    that, and that's -- you know, Mr. Adon tried

13    to accommodate it by changing the schedule.

14         Q     Okay.  Was that a legitimate

15    concern of Ms. Howe not to let Ashley know

16    of her special needs status?

17         A     Well, I mean, if it's a parent

18    concern, it's legitimate.  However, I think

19    that when a team of professionals agrees

20    that a child needs a certain level of

21    services, I think that in my experience most

22    students can work to get over that stigma

1     and still receive benefit from services.  So

2     although that is a concern that's brought up

3     by parents, sometimes the student

4     themselves, I mean, that's part of the

5     educational plan to address the student

6     issues, but still provide them with the

7     services that they're supposed to get.

8               But she did need full-time

9     services, and I think there would be more of

10    a problem of not getting the services rather

11    than being identified as a special ed.

12    student.

13        Q     Do you know if at any time either

14    you or any member of the Options School team

15    had informed Ashley of her disabilities?

16        A     No.  I remember that right after

17    the meeting, I believe both parents took the

18    student out of the classroom and let her

19    know that she was special education.

20        Q     And the mother was involved in

21    that decision?

22        A     Yes, she was.

1          Q    All right.  In your professional

2    opinion, what is the appropriate level of

3    services for A▮▮▮▮▮▮

4          A    I believe what was elicited on

5    the IAP, 24 hours a week, because she needs

6    assistance in her core academic areas.

7    While there's a concern about being in

8    special ed., she would still have access to

9    regular education activities, you know, like

10   music, Spanish, technology, and also the

11   chance to each with regular ed. students on

12   trips.  So it's not that type of program

13   where she is completely removed from her

14   non-disabled peers.

15              MR. HOUSTON:  Thank you.  I have

16   no further questions at this time.

17              HEARING OFFICER BUTLER-TRUESDALE:

18   Ms. Towns?

19              MS. TOWNS:  Yes, I have a few

20   questions.

21              THE WITNESS:  Sure.

22              MS. TOWNS:  I'd like to refer you

68

1    to the psycho-educational evaluation that

2    you completed.

3                    THE WITNESS:  Okay.  That's?

4                    MS. TOWNS:  Okay.  In my

5    document, it's AH-3.

6                    THE WITNESS:  Okay.

7                    CROSS EXAMINATION

8                    BY MS. TOWNS:

9         Q    All right.  You were aware that

10   Ashley is a 13 year old student who has,

11   prior to the request by the mother for

12   evaluations, was in a regular ed. class.

13        A    Correct.

14        Q    And you were aware that she was

15   not being successful in those classes, and

16   that the mom's request for evaluations was

17   to really get a full scope of Ashley's

18   problems and what we could do in terms of

19   addressing those problems.

20                    In your evaluation, I'd like to

21   turn to --

22                    HEARING OFFICER BUTLER-TRUESDALE:

1    Was that a question?  And I didn't hear a

2    response.

3                MS. TOWNS:  That was were you

4    aware of these things that I -- that A▇▇▇▇

5    was a student for whom Mother was requesting

6    evaluations in order that she would be able

7    to rely on you, on the school to provide the

8    best, appropriate placement for her or the

9    most appropriate program for her.

10                THE WITNESS:  Just repeat that

11    question again.  I'm sorry.

12                BY MS. TOWNS:

13        Q    Were you aware that the reason

14    for the mother's requesting evaluations was

15    to get a clear understanding of Ashley's

16    problems, thereby being able to rely on the

17    school for the most appropriate program?

18        A    Yes.

19        Q    Okay.  You conducted the psycho-

20    ed. evaluation where you looked at several

21    areas.

22        A    Correct.

1          Q     I'd like to refer you to your

2     report of that evaluation.  The visual motor

3     assessment, I believe you indicated here.

4     Was there an indication based on that aspect

5     of the evaluation that further inquiry would

6     be helpful?

7          A     No, not at that time because it

8     didn't appear to be interfering with her

9     actual construction of words that was

10    observed in her academic testing.  So

11    actually that score is in the low average

12    range, not below average, but low.  So she's

13    on the lower end of average.

14         Q     So it's only if it were below --

15         A     Correct, yes.

16         Q     -- that you would then have some

17    further inquiry.

18         A     Yes, and if the teachers have

19    reported any difficulties with production of

20    writing, then I'd be concerned about it.

21         Q     If the teachers had reported or

22    you indicated, I think, also that you did

71

1    some observations.

2            A    Yes.

3            Q    So by your observations as well?

4            A    Yes.  I didn't think it was

5    necessary.

6            Q    Okay.  The behavior assessment

7    that's just below that, was there a finding

8    that A███████may be ADHD?

9            A    Ashley --

10           Q    Or would you --

11           A    Yeah, that measures problem

12   behaviors often associated with ADHD, but it

13   can just give you a screen of whether or not

14   there are particular problems.  The scores

15   were so high and, you know, taking that

16   together with knowing the teacher and that

17   Ashley wasn't getting -- if we assume that

18   the problem had been continuing over time

19   before she even go to Options --

20           Q    Okay.

21           A    -- I guess there was some

22   frustration with the teacher with some of

1    the behaviors because --

2         Q    Okay.

3         A    -- you know, the student couldn't

4    perform academically.  So I thought that

5    considering those scores within the context

6    of the entire evaluation that it was more of

7    a learning problem because in my experience

8    most children who are exposed to academics

9    that are on grade level without any sort of

10   specialized services, they're going to get

11   frustrated and --

12        Q    So you're pretty much

13   generalizing as opposed to making this

14   specific to A███████

15        A    No, I said within the context of

16   the evaluation.

17        Q    Okay.

18        A    Yeah, with this particular

19   evaluation.

20        Q    Okay.

21        A    It seemed like the learning

22   problems were more dominant.

1        Q     Yeah, the learning, yes.  Okay,

2    and I see in your brief clinical interview

3    that's on your first page that you

4    determined that A████ was a child who does

5    have acting out problems, that she has been

6    suspended, and that it is reported in her

7    classes that she has behavior problems as

8    well?

9        A     Those were prior to attending

10   Options.  So I couldn't really comment

11   because if she was -- you know, according to

12   the mom she had these problems before coming

13   to Options and she wasn't receiving any

14   services.  I don't know that that would be a

15   disability.

16              So  from what we observed at the

17   school, we didn't see any significant

18   behavior problems.  It was more of problems

19   in learning.

20       Q     Okay.  On page 8 of your report,

21   you say, "Based on the teacher data, A████

22   appears to exhibit severe symptoms often

74

1    associated with ADHD, such as inattention

2    and hyperactivity."  Then you say, "For

3    example, items related to distractibility,

4    restlessness."

5                 Are these associated with A█████

6    or is this a general, that you're suggesting

7    that this may be?

8         A     Based on the teacher responses,

9    those are some of the -- those are some of

10   the behaviors that she observed.

11        Q     Okay.  Then further you say

12   oppositional behavior and problems with

13   thinking were also reported.

14        A     Right.

15        Q     Would you say that that is not

16   enough indicators to at least raise the

17   question as to whether a clinical would be

18   in order?

19        A     Well, that's why I present the

20   information at MDT, and I encourage members

21   not to just base it on the evaluation, and

22   at the particular time when the teachers

1    were present, they weren't raising issues

2    about behavior.  They were raising issues

3    regarding academics.

4        Q    But based on your report, what

5    was your recommendation regarding a

6    clinical?

7        A    No, I didn't recommend it at the

8    time.

9        Q    Based on your --

10       A    I didn't see the need.  I looked

11   at it as more a longstanding problem with

12   not getting academic services.

13       Q    You came to that --

14       A    That was the kind of --

15       Q    You came to that based on

16   something --

17       A    The evaluation.  My evaluation of

18   Ashley.

19       Q    You came to it that her problems

20   were more related -- were symptomatic of the

21   academic?

22       A    Correct.

1           Q      And you were able to distinguish

2      that from behavioral problems in and of

3      themselves in terms of which came first, the

4      chicken or the egg?  You were able to

5      determine that there were not clinical

6      issues that needed to be addressed further?

7           A      Could you repeat that question

8      for me?

9           Q      Did you determine as a result of

10     your evaluation that there were no clinical

11     issues that may be separate from academics

12     because you mentioned a lot of symptoms in

13     your evaluation?

14               MR. HOUSTON:  I object.  That's

15     been asked and answered several times, that

16     he did not believe a clinical was warranted

17     based upon his evaluations, and that was his

18     professional opinion.

19               MS. TOWNS:  Okay.

20               HEARING OFFICER BUTLER-TRUESDALE:

21     Let me make the ruling, please.

22               MS. TOWNS:  Thank you.

1              HEARING OFFICER BUTLER-TRUESDALE:

2    I'm sustaining the objection because I think

3    I have heard him explain why he did not

4    further recommend a psychiatric or clinical.

5              MS. TOWNS:  Okay.  No further

6    questions.

7              HEARING OFFICER BUTLER-TRUESDALE:

8    Any redirect?

9              MR. HOUSTON:  Yes, just one last

10   thing.

11              REDIRECT EXAMINATION

12         BY MR. HOUSTON:

13     Q    If you can turn your attention to

14   your evaluation on page 8, the bottom

15   paragraph, that section is under the

16   summaries and recommendations; is that

17   correct?

18     A    Correct.

19     Q    And can you just tell us what you

20   do in the summary and recommendation of an

21   evaluation?

22     A    What I do is I do a test based

1   report.  So I have individual sections for

2   each test.  So I present the results for

3   each of those tests, and then I try to

4   integrate the information because obviously

5   I don't want to take the results from one

6   test and generalize it to all areas.  So

7   what I do is try to give the summary of all

8   the information at the end and then make

9   some specific recommendations to how to

10  address the difficulties addressed in the

11  summary and also present what the strengths

12  are so that the people have the sense of

13  where they should meet A██████ as far as

14  making her successful in the academic

15  environment.

16          Q      There were some questions about

17  some of these ADHD symptoms, oppositional

18  symptoms, but the last paragraph on that

19  page 8, can you read us that last paragraph

20  on page 8?

21          A      Sure.  "██████ exhibits multiple

22  behaviors often characteristic of attention

1    deficit hyperactivity disorder and

2    oppositional defiant disorder. However, the

3    observed behaviors could be a consequence of

4    severe learning difficulties rather than a

5    disruptive behavior disorder. Thus,

6    intensive special education services are

7    needed to improve academic functioning. It

8    is expected that behavior problems will be

9    curtailed once services are in place to

10   Ashley's benefit. She enjoys reading

11   materials of self-interest and has a

12   positive relationship with peers."

13        Q    Thank you.

14             So that was your professional

15   clinical opinion, that with the learning

16   disabled services, her other behavioral

17   problems would go away.

18        A    Yes.

19        Q    Thank you.

20             HEARING OFFICER BUTLER-TRUESDALE:

21   I think Mr. Adon is trying to get your

22   attention.

80

1            MR. ADON:  I wanted to add that

2     once we did put her in a self-contained

3     classroom, she didn't have any problem.

4     Like there weren't any problems.

5            MR. HOUSTON:  Thank you.

6            I have nothing further for Dr.

7     Cranford.

8            HEARING OFFICER BUTLER-TRUESDALE:

9     Okay.  Your next witness.

10            (The witness was excused.)

11            MR. HOUSTON:  Yes, Mr. Gregory

12     Bush.

13            HEARING OFFICER BUTLER-TRUESDALE:

14     Mr. Bush, would you raise your right hand,

15     please?

16     Whereupon,

17            GREGORY L. BUSH

18     was called as a witness by counsel for the

19     DCPS and, having been first duly sworn, was

20     examined and testified as follows:

21            HEARING OFFICER BUTLER-TRUESDALE:

22     Thank you.

81

1                    DIRECT EXAMINATION

2                BY MR. HOUSTON:

3        Q    Mr. Bush, can you tell us your

4   relationship to A█████ H█████

5        A    I'm Ashley's father.

6        Q    Okay.  Were you present at the

7   meeting on January 12, 2006?

8        A    I don't know the exact dates, but

9   I was present for certain meetings.

10       Q    If you'd look at Document No. 14,

11  that's the January 12th meeting notes.

12       A    Yes.

13       Q    Is that -- on the signature line,

14  the fourth signature, it says Gregory L.

15  Bush.

16       A    Yes.

17       Q    Is that your handwriting and your

18  signature?

19       A    Yes, that is my handwriting and

20  my signature.

21       Q    Okay.  At that meeting, do you

22  recall Dr. Cranford and the team going over

82

1    their recommendations for Ashley's needs?

2         A     I remember talking to Dr.

3    Cranford about A███████ needs.

4         Q     Okay, and do you recall that the

5    team recommended a self-contained program

6    for A██████

7         A     Yes.

8         Q     Did you object to that?

9         A     No.

10        Q     Did you feel that A██████ at that

11   time had an emotional problem?

12        A     I felt that A█████ had anger

13   issues.

14        Q     Okay.

15        A     Do you -- okay.  Did you raise

16   that at this meeting?  Do you recall?

17        A     I don't remember exactly the

18   conversation we had about the family.

19        Q     Okay.

20        A     Suggested what she needed, and I

21   agreed.  Okay.  Well, if that's what she

22   needs, then put her in it.

1          Q     Okay.  Then two weeks later, on

2     January 26th, Options had another meeting,

3     and that's Document No. 13.  Do you recall

4     that meeting?

5          A     This is it?

6          Q     Yes.

7          A     Yes.

8          Q     And is that on the -- where it

9     says Number 6, IAP team participants, is

10    that your signature on the second line?

11         A     Yes, on the bottom of the page,

12    yes.

13         Q     Okay.  So at the time that this

14    was presented to you, it was presented as 24

15    and a half hours to you; is that correct, a

16    full-time special education program?

17         A     Yes.

18         Q     Okay, and that's what you agreed

19    to?

20         A     Yes.

21         Q     Okay, and then you left?

22         A     Yes.

84

1          Q      Did you take part in reducing

2     these hours to 15 hours?

3          A      No.

4          Q      Okay.  Now, did you feel then

5     A█████ at that point on January 26th needed

6     a full-time self-contained program --

7          A      Yes.

8          Q      -- to help her with her academic

9     needs?

10         A      Yes, I did.

11         Q      Okay.  Now, on March 26th, that's

12    Document No. 5 as meeting notes.  Do you

13    recall that meeting?

14         A      That was the meeting in the

15    church?

16         Q      Yes.

17         A      Yeah, I remember that meeting,

18    yes.

19         Q      Okay, and about two thirds of the

20    way down, Gregory L. Bush signature.  Is

21    that your --

22         A      Well, I see it on the top, yeah,

85

1    my --

2         Q    Yes.

3         A    -- name printed and my signature.

4         Q    Yes.  At that meeting, do you

5    recall what the purpose of that meeting was,

6    Mr. Bush?

7         A    Not really.  I mean, it was about

8    her behavior and her placement.

9         Q    Okay.

10        A    Is that cause?  I don't know.

11        Q    Would you remember if they were

12   talking about whether A█████ needed a full-

13   time placement versus a part-time placement?

14        A    Well, I remember how the meeting

15   went.

16        Q    Okay.

17        A    And I remember that I was very --

18   I was not happy with the fact that she had

19   been changed from being a part-time as

20   opposed to being a self-contained class, and

21   I was -- and I kept saying that she needs to

22   be self-contained class.  I remember that

1    part about the meeting.

2         Q    Okay.  Do you recall if you

3    agreed with A████████ mother on that?

4         A    We did not agree on that.

5         Q    Okay.

6         A    On that in that respect.

7         Q    All right.

8         A    As far as being self-contained or

9    part-time contained.

10         Q    At this time do you still believe

11    that A██████ needs a full-time self-contained

12    program?

13         A    Yes, I think she needs full time.

14              MR. HOUSTON:  Okay.  Thank you.

15              I have no further questions for

16    Mr. Bush.

17              HEARING OFFICER BUTLER-TRUESDALE:

18    Ms. Towns?

19              MS. TOWNS:  Yes.

20                   CROSS EXAMINATION

21              BY MS. TOWNS:

22         Q    Mr. Bush, were you aware that

1    A██████ mother requested evaluations at the

2    beginning of the school year?

3         A    Yes.  Her mother had mentioned to

4    me several times that she wanted them to

5    test her.

6         Q    Okay, and what is your

7    understanding of the concern about testing?

8    What was the reason for testing?

9         A    Well, A██████ from what I

10   understand, A██████ does not focus in class,

11   and so that might give somebody the

12   impression that she has problems.  So that

13   raised the issue of we'll test her and see

14   what's wrong with her, if there is anything

15   wrong at all, and that's my interpretation

16   of why she was tested.

17        Q    Okay.  At the initial IAP meeting

18   when it was determined that she had a

19   learning disability and that they were going

20   to -- the recommendation was that she be

21   placed in a full-time class, a full-time

22   program, were you concerned at all or were

1    you clear on what evaluations had been done

2    in order to come to that conclusion?

3        A    I remember the doctor told me

4    what was done as far as the kind of tests

5    they took, but exactly what he said?  I

6    don't remember exactly what he said, no.

7        Q    Were you more or less relying on

8    the school to, based on their professional

9    judgment, to do the tests that were needed

10   and to make the recommendations in terms of

11   her disability code as learning disabled

12   and/or her IAP, the services that she would

13   be receiving?

14       A    Well, I think that that was the

15   thing with the psychiatrist or psychologist,

16   and I asked, "Well, if you know what's wrong

17   with her, you can analyze what the problem

18   is.  So I have no objection to what you say

19   she needs."

20       Q    You were --

21       A    I had no objection.

22       Q    -- relying on him to select what

1    evaluations would be done and to come up

2    with the recommendation?

3         A    That's correct.  That is correct.

4         Q    When you were at the  initial IAP

5    meeting, do you recall one of As▮▮▮▮▮

6    teachers being there?  Because she was in a

7    regular ed. program until the IAP meeting,

8    at which time it was determined that she

9    would be full time special ed.

10        A    I think during the course of the

11   meetings some people did show up, but I

12   couldn't tell you who or when.  I think Mr.

13   Samuels was there.  I think --

14        Q    Is that a regular ed. teacher?

15        A    I know Mr. Samuels, I think,

16   showed up, and Mr. Leonard showed up, I

17   think.

18        Q    When you say "showed up," what do

19   you mean?  They came in and left?

20        A    They were at the meeting.  They

21   were there at the meeting.

22        Q    What do you mean when you say

1    "showed up"?  I'm just trying to find out.

2         A    They were present.

3         Q    Do you mean that they came -- oh,

4    they would come in and join the meeting or

5    did they come in and have comments or--

6         A    At the meeting at the church like

7    on the 27th of March, Mr. Samuels was there,

8    and I believe Mr. Leonard was there also.

9         Q    Those are her regular education

10   teachers?

11        A    I think Mr. Leonard is a regular

12   teacher, but I don't know what --

13        Q    But you're not really clear as to

14   whether a regular ed. teacher was a part of

15   that meeting where decisions were made

16   regarding her --

17             MR. HOUSTON:  At this point I'd

18   like -- excuse me -- I'd like to ask that

19   Ms. Towns' client not shake her head or make

20   any comments about this testimony.  It's

21   distracting to me.  I'm sure it is for Mr.

22   Bush, too.

91

BY MS. TOWNS:

1

2          Q    Mr. Bush, you have indicated --

3    it's on the record that there has been some

4    conflict between you and A███████mother

5    concerning the level of services or the

6    placement for A███████ is that right?

7          A    Well, we disagree on whether she

8    -- as far as her being self-contained and

9    non-self-contained.  That's --

10         Q    Okay.

11         A    I think she needs self-contained.

12   Mom says no.  That's -- we had a

13   disagreement.

14         Q    Okay.  Is it your understanding

15   that before such a decision was made that

16   you would need as broad a testing as

17   possible so that you could be clear about

18   what her full disabilities are or what her

19   problems are, or are you fairly comfortable

20   with --

21         A    Well, I was under the impression

22   that the tests that were done determined

1    that she needed to be in a self-contained

2    class.  So I thought that that was the

3    correct test that was done at that time.  I

4    met with the doctor, and he told me that she

5    would be in a self-contained class.

6           Q    And you pretty much wanted that

7    outcome anyway; is that what you're saying?

8           A    No.  When the doctor said he was

9    a psychiatrist --

10          Q    Okay.

11          A    -- psychologist and he told me

12   that "I've done testing on A▮▮▮▮▮  She

13   needs to be in a self-contained class," then

14   I understood that he meant she needed a

15   self-contained class.

16          Q    Okay.

17          A    Now, as far as --

18          Q    Hours regulated.

19          A    -- the tests he took and how the

20   range they went, I don't know all of that.

21   I'm not a psychologist.  So I can't tell

22   you.

1          MS. TOWNS:  Okay.  No further

2    questions.

3              HEARING OFFICER BUTLER-TRUESDALE:

4    Redirect?

5          MR. HOUSTON:  No.

6              HEARING OFFICER BUTLER-TRUESDALE:

7    Is that your last witness?

8          MR. HOUSTON:  Yes, that was my

9    last witness.

10              (The Witness was excused.)

11              HEARING OFFICER BUTLER-TRUESDALE:

12    Ms. Towns, who will be your first witness?

13          MS. TOWNS:  My first witness will

14    be LaTanya Higginbotham.

15              HEARING OFFICER BUTLER-TRUESDALE:

16    Okay.  I think I want to hear from the

17    mother first.

18          MS. TOWNS:  From the mother

19    first?  Okay.

20              HEARING OFFICER BUTLER-TRUESDALE:

21    Yes.

22          MS. TOWNS:  All right..  We'll

94

1    hear from the mother first.

2                    HEARING OFFICER BUTLER-TRUESDALE:

3    Would you raise your right hand, please?

4    Whereupon,

5                        CAMILLE HOWE

6    was called as a witness by counsel for the

7    Student and, having been first duly sworn,

8    was examined and testified as follows:

9                    HEARING OFFICER BUTLER-TRUESDALE:

10   Ms. Towns.

11                    DIRECT EXAMINATION

12                    BY MS. TOWNS:

13        Q    Ms. Howe, will you state for the

14   record when you initially informed the

15   school of your interest in having

16   comprehensive testing for A████████

17        A    Yes.  I came to the school -- I

18   left the other school during the summertime

19   because a teacher from the other academy

20   that A██████ was attending during the

21   summertime told me that she -- she was like

22   called me over the phone.  She said, "Ms.

1    Howe, I'm going to write up this letter.

2    A██████ have not been tested, the full

3    comprehensive testing."  Said she need to

4    be.  I mean haven't been evaluated properly

5    since she had been at school.

6              So she said that -- heard that

7    she was transferring her to a new school.

8    She said, "Take this letter; go to the

9    school ASP.  Talk to someone to get her

10   tested before she start in September."

11        Q    Okay.

12        A    So by me being in special ed.

13   when I was coming up, I thought that when I

14   went to the school that I met with Mr. --

15        Q    Adon?

16        A    -- Adon in the cafeteria, that my

17   child were tested, which he did say they was

18   going to take care of it.

19        Q    Okay.

20        A    Not -- well, I'm thinking the old

21   fashioned way, that when you go to these

22   people and ask these people, hey, a child

1    really needs to be tested.  We see all of

2    these faults, and seeing all the failures

3    that she's been going through from last year

4    from the other school, I'm thinking that

5    they was going to take care of her right

6    then and there.  I didn't know that it takes

7    like 100-and something days because when I

8    was growing up you get tested right then and

9    there.  You'd be replaced.  You'd get

10    everything from hearing, speech, everything.

11            But I was thinking that at the

12    time when he said they was going to test

13    her, all that past stuff left my mind

14    because I was like I put my daughter in

15    their hands, and I'm sitting here saying

16    okay.  Everyday something was happening to

17    Ashley in the classroom.  I was getting

18    phone calls constantly.

19            When I stood in the school again

20    in September, threw my hands up every time I

21    came up there, she needed to be tested.

22    Every day I was getting a call at least

1   three times a week.  I said my child was

2   frustrated.  She needed to be tested.

3            "Oh, we're going to test her.

4   We're going to test her."

5            Okay.  They kept on assuring me

6   that, from September all the way up to the

7   time they test her because she never got

8   tested until October.

9            So when A█████ got tested in

10  October, November was rolling around, and I

11  have a business.  So I'm constantly like

12  working, and at the time, I -- I forget the

13  name.

14            MR. BUSH:  Dr. Cranford.

15            THE WITNESS:  Dr. Cranford, you

16  know, went on an test her, but then when

17  November came around they asked me to come

18  back for the meeting which I couldn't

19  because I have a job to.  So I said schedule

20  me for another appointment, and that's when

21  January came around.

22            So during all that processes from

1    August all the way up to that time, A███████

2    was frustrated every day.

3              MS. TOWNS:  Okay.

4              THE WITNESS:  Every day, "Mom,

5    I'm doing my work, but I'm not getting

6    enough help," or, "the teachers did this,"

7    or, "I'm acting up and they don't like me."

8              It wasn't that they didn't like

9    her.  She just didn't have no understanding

10   why she's acting out the way she was, and my

11   daughter was going through something.  I was

12   so depressed because I knew in my heart that

13   they didn't give her the proper things that

14   she needed.  When I said that they wasn't

15   doing their job, it was I was telling them

16   what was going on, you know, asking them.

17             But in my mind I'm thinking that

18   she's getting all of this testing.  I'm not

19   familiar with all of the other stuff like

20   the behavior and speech anymore because I

21   thought that was all included.  So when he

22   set me down, he was like, "We evaluate your

1    child."

2              And I don't understand all of

3    that educational stuff that he put in there.

4    I just take a little bit at a time and say,

5    "Okay. Well, maybe they're doing their

6    job," you know, as far as in that area. I'm

7    not aware of all these things.

8              MS. TOWNS: Okay, okay.

9              THE WITNESS: So A██████ been

10   frustrated, and I've been frustrated with

11   them, and yes, I was battling with them

12   about her. I've been battling with two

13   schools and them.

14             MS. TOWNS: Okay.

15             MR. HOUSTON: Just as a point of

16   clarification, the question, I believe, was

17   when did you ask the school, and I don't

18   believe she ever answered that question. Do

19   you?

20             THE WITNESS: When did I ask the

21   school what?

22             MR. HOUSTON: The original time

1    of testing, I believe, was the original

2    question.

3                    THE WITNESS:  Oh, I stayed in

4    their face every day about testing.  I came

5    up there three times a week.  It wasn't no

6    just one day.

7                    MS. TOWNS:  Okay.  I don't think

8    that there is any controversy in terms of

9    the fact that from the beginning of the

10   school year Mother was asking the school --

11                   THE WITNESS:  Every week.

12                   MS. TOWNS:  -- for testing and by

13   even the testimony of others --

14                   THE WITNESS:  About testing until

15   they finally did it.

16                   MS. TOWNS:  Okay, all right.

17                   BY MS. TOWNS:

18       Q      Then the IAP meeting was held on

19   1/26/06; is that right?

20       A      Un-huh.

21       Q      Did you attend that meeting?

22       A      Un-huh.

1          Q      Okay.  According --

2          A      Yes.

3          Q      According to your recollection,

4    was either one of her regular ed. teachers a

5    part of that meeting?

6          A      I don't know if it was the first

7    meeting Ms. Griser came up briefly, briefly.

8    Whoever the teacher was, they came in

9    briefly.  Ms. Griser, one of the other

10   teachers  that was a gentleman that came in.

11   They just like briefly came in.

12         Q      And made comments?

13         A      Made their comments and stuff.

14         Q      Okay.

15         A      And they've been making their

16   comments before they even came to the

17   classrooms, too, from what I've been

18   hearing.

19         Q      Okay.  When you attended that IAP

20   meeting, what was your understanding about

21   the battery of tests that A██████ had

22   received before the decision for her

1    disability was determined?

2         A    Okay.  Just like I said, I

3    thought they was fully testing her.  Like I

4    say, I'm not familiar with all of the terms

5    and everything.  So I'm putting it in their

6    hands that she was properly tested.  But --

7         Q    What are some of the tests that

8    you had understood would be a part of this

9    comprehensive testing?

10        A    Her psychological test, her

11   behavior test.  I was aware of that a little

12   bit, but I wouldn't agree on it because I've

13   read some of it, but I wasn't agreeing on

14   everything because I was like, okay, it

15   didn't seem like it was enough to me.

16        Q    Okay.

17        A    So when -- after the meeting they

18   asked us to sign these papers, and that's

19   when they was telling me agree with her

20   being placed in four special ed.  Well, he

21   was already there.  I wasn't agreeing with

22   it

103

1          Q     Okay.  Was it your feeling that

2     she needed additional testing or --

3          A     Yes.

4          Q     -- what did you --

5          A     I think it was.  I was feeling

6     something wasn't right.  I was -- at the

7     time I wasn't agreeing with it because they

8     waited to the last minute and just took my

9     child out of her classroom and said, "Oh, by

10    the way, we're going to put her in this

11    classroom with like almost 19 students

12    that's not as big as this room," which the

13    teacher is -- he's actually a teacher.  I

14    met with him from day one, but I was feeling

15    A███████wasn't feeling it.  She was like,

16    "Mom, what are they doing?" and I was trying

17    to wean her a little by saying, "Well,

18    you're going to have to go to these

19    classrooms."

20               I could never once not tell her

21    that she was not going in special ed. at

22    all.  I was trying to let her know that if

104

1    she go in there, I didn't want her in there

2    the whole day.  She didn't want to be in the

3    whole day.  So I was really frustrated with

4    that because you just don't take a child

5    after she's been in the -- supposed to be

6    special ed. environment.  They have two

7    teachers in the classroom telling us that

8    they was going to teach my daughter to the

9    best of they -- well, let's put it this way.

10   He told me they was teaching her, but then

11   at the same time she couldn't keep up.

12          I'm like this is supposed to be

13   special ed.  Okay.  That's what I was told,

14   and then all of a sudden now let's put her

15   in the little environment, which collects a

16   self-contained class with the other

17   students, which she wasn't familiar with

18   none of the students.

19       Q    Okay.

20       A    She was familiar with the

21   teacher, and she was -- and most kids get

22   teased in school about special ed.  She

1    don't really know that it's great to be in

2    there, but she -- it was more her peers was

3    teasing her, and she did not want to be in

4    there all day.

5         Q    Okay.  So was your concern -- did

6    you attend the resolution meeting?

7         A    Un-huh.

8         Q    And at the resolution meeting,

9    according to your recollection was there any

10   request for further testing?Options Public

11   Charter School

12        MR. HOUSTON:  I object.  Ms.

13   Towns has been leading this witness for a

14   long time with her questions, and I've kind

15   of let that go, but I object to Ms. Towns'

16   leading questions for her witness.

17        MS. TOWNS:  My, as I indicated in

18   my opening statement, the major issue here

19   is the fact that the parents relied on the

20   school to give her daughter a comprehensive

21   battery of tests, and the school only gave

22   her child one.

1          MR. HOUSTON:  I object to this.

2          MS. TOWNS:  And therefore --

3     therefore -- therefore --

4          MR. HOUSTON:  Because it doesn't

5     address -- it does not address the

6     objection.  The objection is Ms. Towns is

7     leading her witness.  She's not allowed to

8     do that.  I've let her do that several

9     times, and she's putting testimony into her

10    witness' mouth.

11         HEARING OFFICER BUTLER-TRUESDALE:

12    Okay.  Well, because it's really important

13    that we spend the remainder of the time in a

14    manner that will be most helpful to me in

15    terms of making the appropriate findings of

16    fact, I'm going to ask a few questions.

17         Unfortunately, I need to step out

18    of the room for less than, I hope, less than

19    five minutes because I want to see what the

20    status of my 11 o'clock hearing is so that I

21    can figure out how to best use the rest of

22    the time that we have.

1        I will come back and I will ask

2    the questions that I think that I need to

3    ask in order to make the proper findings of

4    fact because, while it is very important to

5    allow the attorneys to put the record on

6    that they want to put on, then in instances

7    where we only have two hour hearings and the

8    parents asks for the time frame of the

9    hearing, I have to wrap it up and cut them

10   off at some point so that I can make the

11   appropriate findings of fact in a two hour

12   time period.

13            THE WITNESS:  Okay.

14            HEARING OFFICER BUTLER-TRUESDALE:

15   Okay?  So just give me a few seconds and let

16   me see whether that I'm really only working

17   with 40 minutes or whether or not the other

18   hearing has been continued or withdrawn.

19            THE WITNESS:  Okay.

20            (Whereupon, the foregoing matter

21            went off the record at 10:35 a.m.

22            and went back on the record at

1          10:38 a.m.)

2               HEARING OFFICER BUTLER-TRUESDALE:

3     Okay.  Thank you very much.  We're back on

4     the record.

5               And my 11 o'clock hearing, thank

6     goodness, has been settled.  So I do have

7     some additional time.

8               So I think what I will let you do

9     is die on your own swords and proceed.

10              MS. TOWNS:  That's a bad --

11              (Laughter.)

12              HEARING OFFICER BUTLER-TRUESDALE:

13    And proceed, and then if I still do not have

14    the information that I think that I need,

15    when you're finished I'll ask the questions.

16              MS. TOWNS:  Let me ask you just a

17    few more questions.

18              BY MS. TOWNS:

19         Q     You attended the resolution

20    meeting, did you?

21         A     Yes.

22         Q     Would you -- do you have those

1    notes before you?  Let met get them.

2                    At the resolution meeting,  what

3    was your main concern for your daughter?

4                    Let me ask it this way.  At the

5    resolution meeting, were you still concerned

6    about comprehensive evaluations for your

7    daughter --

8           A    Yes.

9           Q    -- before a final decision was

10   made?

11                   MR. HOUSTON:  I object.

12                   THE WITNESS:  Yes.

13                   MR. HOUSTON:  I object for the

14   same reason.  That's a leading question.

15                   HEARING OFFICER BUTLER-TRUESDALE:

16   Are you able to rephrase the question?

17                   MS. TOWNS:  Yes.

18                   HEARING OFFICER BUTLER-TRUESDALE:

19   However, she has already answered it.

20                   BY MS. TOWNS:

21          Q    At the resolution meeting, at the

22   resolution meeting what were your main

110

1    concerns for your daughter?

2              The resolution meeting, of

3    course, was in response to us having filed

4    on your behalf a due -- a request for a due

5    process.  What were your main concerns at

6    that meeting?

7         A    My main concerns, when I walked

8    in the meeting, I came a little late due to

9    parking around there, like today.  I still

10   wasn't satisfied.  My daughter is not

11   satisfied.  I still think that she need more

12   than what they was giving her, which some of

13   the things that they was giving her was

14   okay, but my daughter was not being

15   evaluated properly, and I already seen

16   through it.  This is the second time I've

17   seen this riff-raff (phonetic) going on

18   again about her not getting properly tested

19   like she should be where she already

20   frustrated in the classroom.  She's already

21   failing coming up.  She's got to go to

22   summer school all over again, and like I

111

1    said, if they were to test her from the

2    beginning, when they seen me coming in there

3    frustrating three times a week in September,

4    that she probably would have been maybe in

5    the classrooms that they wanted her to be

6    in.

7                    And by the way, upstairs they say

8    some of the special eds. are full.  You

9    know, I don't know nothing about the special

10   eds. upstairs, but they have one with active

11   children and they still have some other

12   teachers, but they was booked up.

13                    MS. TOWNS:  Okay, all right.  No

14   further questions.

15                    HEARING OFFICER BUTLER-TRUESDALE:

16   Cross?

17                    MR. HOUSTON:  Yes, ma'am.

18                    CROSS EXAMINATION

19                    BY MR. HOUSTON:

20        Q    You attended the January 12th

21   meeting.

22        A    Yes.

1          Q     At that meeting Dr. Cranford

2     explained the results of his testing; is

3     that correct?

4          A     Explained a little bit.  I had a

5     little bit of understanding.  Like I said,

6     his stuff is a lot of clinical stuff that

7     I'm not aware.  He just gave me -- well, he

8     was trying to explain it to me, but like I

9     says, when you're speaking on the doctor's

10    terms, it's pretty huge.  Okay?

11              And like I said, it was nothing

12    wrong with him giving her the tests, but

13    that wasn't the appropriate test that A█████

14    still should have been having because it

15    didn't change anything.

16         Q     Okay.  Did you have any questions

17    of Dr. Cranford at that meeting?

18         A     How can I have something that I

19    wasn't familiar with?  You know what I'm

20    saying?  Like if I know about she should

21    have had speech, I would have brought it up,

22    the subject.  If I knew about the things

1    that she's supposed to had, that's -- I knew

2    about it, but I just couldn't get it out.

3    Okay?  Yes, I would have had it all in

4    writing in his face.

5                    And I wasn't happy with her going

6    to no -- just snatching my child out of the

7    classroom when she has been in the

8    environment and then all of a sudden just

9    put her in a classroom with 18 students that

10   she wasn't familiar with.  You would be

11   frustrated, too.  I've been frustrated ever

12   since I walked through the door.

13        Q    So to go back to my question, you

14   didn't ask Dr. Cranford any questions about

15   his evaluation.  That's a yes or a no, Ms.

16   Howe.

17        A    We asked some questions.  It

18   wasn't like the questions I should have

19   asked him.

20        Q    Okay.

21        A    Yeah, we did because I did ask

22   some questions.

114

1          Q     At the --

2          A     Just about what was that.

3          Q     At that meeting, the team decided

4     that Ashley needed a self-contained program.

5     Did you at that time say, "No, that's not

6     right for A▌▌▌▌▌

7          A     Yes.

8          Q     Okay.

9          A     What team?  It wasn't nothing but

10    him and him.

11         Q     Okay.

12         A     Are you talking about the team of

13    teachers and all of that?  It wasn't none of

14    them in there.

15         Q     Okay.  You testified that A▌▌▌▌▌

16    needs more.

17         A     Yes, she do.

18         Q     What is it that she needs more

19    of?

20         A     She need like as far as her being

21    fully tested why she acting out, why she

22    frustrated every time she comes to school

115

1    every day, you know.  I get phone calls

2    constantly from the school, from Mr.

3    Samuels.  A█████ is going to be put out.

4    Ashley is suspended.

5            I send A█████ to school early.

6    She get there a little late.  "We're going

7    to send her home."  A█████ up in the

8    hallways.  Still getting calls this week.

9    Same old, same old.  Ain't nothing changed.

10        Q    Okay.  If she was in a self-

11   contained program -- well, strike that.

12           Was Ashley in a program where

13   there was a special education teacher from

14   the very beginning of the school year?

15        A    From this school?

16        Q    Yes.

17        A    A special -- no.  They always had

18   two teachers in the classroom from what I

19   was told.

20        Q    Okay.  Was one of them --

21        A    And they're supposed --

22        Q    Was one of them a special

1    education teacher?

2          A     From what I was supposed to be

3    told, that they're supposed to have special

4    ed. teachers in the classroom.

5          Q     From the beginning of the school

6    year?

7          A     From the beginning of the school

8    year.  So that's why I was feeling safe that

9    she was in that type of environment on that

10   type of level where they said two teachers

11   are going to be in there.  One is going to

12   help the -- one take time out when the other

13   student needs help.  So I was happy with

14   that when they told me that, but then when

15   she was failing, I was not happy.

16               I knew she was failing because

17   she said, "Mommy, sometimes the teachers

18   can't work with all of us," you know, even

19   though it was two of them because they have

20   to -- they only give you a 15 minutes like

21   grace, and if you don't keep up, you left

22   behind.  They give you 15 minutes to try to

1    catch up with all the other students.  If

2    you don't catch up, you left behind.

3              So that means she was sitting

4    there acting out, being frustrated because

5    she couldn't keep up with the other so-

6    called special ed. students.

7              I ain't ever heard such things in

8    my life.

9         Q    At what point did you think that

10   you needed to get all of these other testing

11   done on her?

12        A    What point?

13        Q    Yes, ma'am.  It came to the point

14   when I said I didn't want her in the full

15   class, that's when I realized that I needed

16   some more help.  That's when I came to them.

17        Q    Okay.  Let --

18        A    Because I knew something was

19   wrong.

20        Q    Did you ask at that January 26th

21   meeting for additional testing?

22        A    How can I ask for something that

118

1    I thought that they was already, you know,

2    pursuing, what they was already doing?

3           Q    Okay, but you just said that it

4    was at that time when you realized that she

5    needed more.

6           A    Right.  She did need more.

7           Q    So what did you ask of the school

8    at that time?

9           A    At the time, I couldn't ask too

10   much.  The only thing they was giving me,

11   they was giving me, "We're going to give her

12   classroom."  I couldn't ask, you know, like

13   give me this, give me that.  They was giving

14   me.  We're going to put A███████ in a self-

15   contained class, and then I said, well, no,

16   I don't want her in that class, or they

17   would let her go to her other teachers

18   because I don't think that she was going to

19   make it in that self-contained class.

20              And then I have been -- I've bene

21   looking for someone to get me some help, and

22   like I said, that's when I found them.  I've

1    been looking for them for a long time, and I

2    finally got the number on my own to go get

3    some help because I couldn't do it anymore.

4         Q    Was that when you realized that

5    you needed more testing?

6         A    Yes.

7         Q    When they told you that you

8    needed more testing?

9         A    Well, not even only that.  They

10    opened up the door because of the fact that

11    I knew about this, like I said.  I just

12    couldn't be -- how do you say it?  I

13    couldn't speak about it.  I didn't know, but

14    I knew she needed it.  When they -- I said,

15    "I thought they give you that.  I thought

16    they give you the speech," you know, because

17    when I was coming up they give you all of

18    that when you need to be tested at school.

19    I didn't know the system had changed.

20         Q    Okay.

21         A    So when they was telling me this,

22    I was like, "Yeah, I thought she would get

1    that.  I thought she'd get the speech."

2                    They do that to kids, you know.

3    I thought they still do that to students in

4    the beginning of the year when you're

5    getting tested.  They always evaluate the

6    students anyway when they come to school.

7    I'm thinking they'll still be the speech and

8    all of that.  I'm finding out it's not like

9    that because this is a charter school.

10        Q    Okay.  When you contacted Ms.

11   Towns, did you then ask the school to do

12   additional testing?

13        A    When I contacted her?

14        Q    Yeah.  After that did you ask the

15   school to do something different for your

16   child?

17        A    Because, yeah, because you know

18   why I asked them?  Because she still was

19   acting out.  Wouldn't you ask your child

20   that?

21        Q    So after you contact Ms. Towns,

22   then you ask the school to do more testing.

1        A      She needs it.  She needs it.

2        Q      Okay, and when was that that you

3    asked the Options Public Charter Schools to

4    do additional testing?

5        A      We asked right when we came to

6    the meeting, the date that I had -- let me

7    slow down.  The day that I met them I was

8    telling them that I had --

9        Q      I'm sorry.  Ms. Towns, could you

10   not be prompting your witness.

11              HEARING OFFICER BUTLER-TRUESDALE:

12   I didn't see her prompting.

13              MR. HOUSTON:  Well, she was

14   nodding her head and mouthing words to her.

15              MS. TOWNS:  I'm thinking of

16   objecting to your line of questioning.

17   That's what I'm thinking.

18              HEARING OFFICER BUTLER-TRUESDALE:

19   Okay.  Well, here's what we've got here.

20              THE WITNESS:  I want to say --

21              HEARING OFFICER BUTLER-TRUESDALE:

22   From what I -- from what I think that the

1      mother is explaining to me, and you can tell

2      me if I'm off base, I think you're

3      explaining to me that you yourself have some

4      communicative limitations.

5                    THE WITNESS:  Yes.

6                    HEARING OFFICER BUTLER-TRUESDALE:

7      Because not all of your responses are in

8      line with the questions that are being asked

9      of you.  I think I understand in some of the

10     questions that you're answering.  I think I

11     understand, but I'm piecing a lot of puzzles

12     from your entire testimony as to what I

13     think you mean with your answers to

14     questions.  Because not all of the answers

15     that you've given have been entirely

16     responsive or responsive.  Okay?

17                    THE WITNESS:  Yes.

18                    HEARING OFFICER BUTLER-TRUESDALE:

19       So in that light, I'm not even certain

20     that it's appropriate for me to allow both

21     counsel to use the regular lines of

22     questioning in terms of witnesses and what

123

1    your capacity is to follow the question and

2    answer the question.  Okay?

3                    So let me just state right now

4    that I think that this case is probably

5    about your impression of a comprehensive,

6    that is, an entire universe of tests --

7                    THE WITNESS:  Yes.

8                    HEARING OFFICER BUTLER-TRUESDALE:

9       -- being given to your child, and what

10   is, as you've been stating several times

11   yourself, the hard law, which states that

12   the child is to be tested in all suspected

13   areas of disability.

14                   So there's a difference between

15   what your expectations were and what the law

16   now requires.

17                   THE WITNESS:  Yes.

18                   HEARING OFFICER BUTLER-TRUESDALE:

19   Okay?  So it really gets down to in terms of

20   how your attorney, I think, raise the

21   hearing request because they don't give us

22   time all the time to read the hearing

124

1    request before the hearing.

2              THE WITNESS:  Yes.

3              HEARING OFFICER BUTLER-TRUESDALE:

4    But from what has been explained to me that

5    the hearing request said, it appears to me

6    that the hearing request is about whether or

7    not your child was properly evaluated,

8    right?

9              THE WITNESS:  Yes.

10             HEARING OFFICER BUTLER-TRUESDALE:

11   Okay.  Now, if the school is simply required

12   to test A█████in all suspected areas of

13   disability, then the appropriate findings of

14   fact that I should make would be about what

15   areas should they have suspected that A█████

16   be tested in and what triggers are you aware

17   of --

18             THE WITNESS:  Yes.

19             HEARING OFFICER BUTLER-TRUESDALE:

20   -- that Ashley was committing in the

21   classroom, not at home, in the classroom

22   that would have prompted the school that