1    they should have done certain tests.

2                    THE WITNESS:  Yes.

3                    HEARING OFFICER BUTLER-TRUESDALE:

4    Now, you already told me also that you're

5    really not aware of the universe of tests.

6    Okay?  That are possible, right?

7                    THE WITNESS:  I'm aware of it,

8    but it just not how you say like they're

9    aware of it.  I knew it was there, but I

10   just couldn't come and ask them to do these

11   things because that's when I got frustrated

12   because I kept saying something is not

13   right.  Some of her stuff is missing, and

14   that's when I called them to get some help

15   because I knew that she wasn't being tested

16   right, but I didn't know the things that she

17   should be getting at the time.

18                   HEARING OFFICER BUTLER-TRUESDALE:

19   So what is it exactly in terms of evaluation

20   that you thought were missing?

21                   THE WITNESS:  Okay.

22                   HEARING OFFICER BUTLER-TRUESDALE:

1      Can you give me examples about that?

2                  THE WITNESS:  Like when she

3      brought to -- like she said, when I'm at

4      them, I was like, "Oh, I thought they'd

5      already do the speech and the hearing and

6      all these things."

7                  HEARING OFFICER BUTLER-TRUESDALE:

8      Now, have you -- are there any reasons that

9      you suspect that ████████ should have been

10     tested for speech and learning?

11                 THE WITNESS:  Because the fact

12     that --

13                 HEARING OFFICER BUTLER-TRUESDALE:

14     Because, see, they're not going to just do -

15     - this is not 1959.

16                 THE WITNESS:  I know.

17                 HEARING OFFICER BUTLER-TRUESDALE:

18     They're not just going to give her all the

19     tests under the sun as a rule-out procedure.

20                 THE WITNESS:  Right.

21                 HEARING OFFICER BUTLER-TRUESDALE:

22     They're not going to do that.

```
 1                    THE WITNESS:  Okay. If you would

 2       see ████ frustrated every day --

 3                    HEARING OFFICER BUTLER-TRUESDALE:

 4       No.

 5                    THE WITNESS:  -- she come home.

 6       Okay.

 7                    HEARING OFFICER BUTLER-TRUESDALE:

 8       Just follow.  Just stay on track.  Speech

 9       and language, I think you said.

10                    THE WITNESS:  Okay.  Well, speech

11       and language.  When she comes home, the way

12       she talk.

13                    HEARING OFFICER BUTLER-TRUESDALE:

14       Not at home.

15                    THE WITNESS:   I mean, well, when

16       in school --

17                    HEARING OFFICER BUTLER-TRUESDALE:

18       Are you aware of any speech and language

19       complications that she would be having in

20       the classroom environment?

21                    THE WITNESS:  Yeah, I think so.

22       I think she's acting out in classroom.
```

128

```
 1              HEARING OFFICER BUTLER-TRUESDALE:
 2      Speech and language problems that she is
 3      demonstrating in the classroom.
 4              THE WITNESS:  Yeah.
 5              HEARING OFFICER BUTLER-TRUESDALE:
 6      Like what?
 7              THE WITNESS:  Cursing and they
 8      say she yells and talk back and using foul
 9      language, which I heard, and they kind of
10      like talk to her and calm her down.  They're
11      going to call your parents on the phone.
12              HEARING OFFICER BUTLER-TRUESDALE:
13      How well does she articulate?
14              THE WITNESS:  In school?
15              HEARING OFFICER BUTLER-TRUESDALE:
16      And by that I mean how well does she form
17      her words.  Is she able to make normal
18      sentence structure, things like that?
19              THE WITNESS:  Yes, when she's not
20      made, yeah.
21              HEARING OFFICER BUTLER-TRUESDALE:
22      Okay.  See, that's speech and language.
```

1    Okay?  It's not really how she chooses to

2    use the words or it's not just about when

3    she decides cussing someone out is

4    appropriate, unless you want to say that

5    that's some type of mental disturbance or

6    mental trigger.  There are certain disorders

7    in terms of how people --

8                THE WITNESS:  Well, she ain't

9    talking with slurred -- like she slurred or

10   anything.

11               HEARING OFFICER BUTLER-TRUESDALE:

12   All right.  Well, let's move on to the next

13   one.

14               THE WITNESS:  Okay.

15               HEARING OFFICER BUTLER-TRUESDALE:

16   Does ███████ wear glasses?

17               THE WITNESS:  No, she get her

18   eyes tested, but --

19               HEARING OFFICER BUTLER-TRUESDALE:

20   So you have had her vision tested on your

21   own?

22               THE WITNESS:  Yeah.

1              MR. BUSH:  Yes.  She just went to

2    one last month.  She was tested.

3              THE WITNESS:  Yeah.

4              HEARING OFFICER BUTLER-TRUESDALE:

5    Okay.  Has she ever worn glasses?

6              MR. BUSH:  No.

7              HEARING OFFICER BUTLER-TRUESDALE:

8    Has she ever worn glasses?

9              MR. BUSH:  Well, they might have

10   gave her some reading glasses for a while.

11             THE WITNESS:  Yeah.

12             MR. BUSH:  We sent her to the

13   clinic for the school test, and they said

14   she had no vision problems.

15             HEARING OFFICER BUTLER-TRUESDALE:

16   Okay.  So no reported vision problems.

17             MR. BUSH:  That's correct.

18             HEARING OFFICER BUTLER-TRUESDALE:

19   Okay.  Now, let me just give you an idea of

20   what the social histories that I've read,

21   what they typically are for, and then you

22   can tell me whether or not you feel that a

1    social history would have been appropriate.

2    Okay?

3                    Most of the social histories that

4    I read are reports of any medications that

5    the child has been taking, any psychiatric

6    counseling outside of school that the child

7    would have had, any almost like a chronology

8    of the child's family environment.  In other

9    words, it's  usually a report to me of any

10    emotional things that are going on in the

11    home that might be triggering or overflowing

12    in the classroom.

13                    How was ████ doing at home?

14                    THE WITNESS:  The same thing she

15    did at school.

16                    HEARING OFFICER BUTLER-TRUESDALE:

17    Which is?

18                    THE WITNESS:  Acting out,

19    frustrated, like almost always I say like

20    argumenting (phonetic) with them like she do

21    at school.

22                    HEARING OFFICER BUTLER-TRUESDALE:

1    So she's argumentative?

2                THE WITNESS:  Yes, yes.

3                HEARING OFFICER BUTLER-TRUESDALE:

4    And you assume that that's also going on in

5    the classroom environment for what reason?

6    Because you're getting the reports of her --

7                THE WITNESS:  Yeah.

8                HEARING OFFICER BUTLER-TRUESDALE:

9        -- acting out?

10               THE WITNESS:  Yea, yeah, yes, all

11   the time, every day.  Just this week Ashley

12   is not in her classroom.

13               HEARING OFFICER BUTLER-TRUESDALE:

14   So now just because she's not in the

15   classroom, how is that tied to her being

16   argumentative at home?

17               THE WITNESS:  It's just the same

18   way.  She'll come in and like, "Mom" --

19   frustrated with school, and she'll come in,

20   "Well, I do my work and they just always

21   tell Mom I'm not doing this and doing that

22   in school," the teachers saying that she's

1    not doing right or they're going to put her

2    out of school, all this.  The teachers

3    consider --

4                HEARING OFFICER BUTLER-TRUESDALE:

5    And right now she's in -- what type of

6    environment is she in right now?  She's not

7    in the self-contained classroom, right?

8                THE WITNESS:  She's in a half a

9    day -- supposed to be in a half a day, self-

10   contained class, and then supposed to be

11   going to other classrooms.  I don't know

12   what they changed again on her.

13               HEARING OFFICER BUTLER-TRUESDALE:

14   Let me explain to you that part of my

15   concern is I know that in many instances

16   when children are classified as learning

17   disabled or even emotionally disabled there

18   is some problems in terms of what they call

19   transitioning usually from one classroom to

20   the other, you know, and if she's

21   transitioning not just from one classroom to

22   the other, but from one type of program to

```
 1        the other, that that could be an emotional

 2        disruption in and of itself.  Okay?

 3                    THE WITNESS:  I understand that,

 4        but you've got to understand that she's

 5        never been in a self-contained class.  She

 6        should have been in there at --

 7                    HEARING OFFICER BUTLER-TRUESDALE:

 8        What is it that you were expecting them to

 9        do to sort of --

10                    THE WITNESS:  Okay.

11                    HEARING OFFICER BUTLER-TRUESDALE:

12        Let me ask the question.

13                    THE WITNESS:  Go ahead.

14                    HEARING OFFICER BUTLER-TRUESDALE:

15        Where you expecting that they would have

16        some type of transitional period with her

17        and wean her from the general education

18        environment into --

19                    THE WITNESS:  No.  What I was

20        expecting from them when I first came, that

21        they'd wait until January, March to take a

22        child from all her life been in going from
```

1    class to class, now all of sudden then one

2    day we're just going to put her in this

3    classroom with just one teacher.

4              No, I don't think so, and like I

5    said, frustrated because of the fact that --

6              HEARING OFFICER BUTLER-TRUESDALE:

7    Okay.  Here we go again.  Now, my question,

8    it sounds like you should have answered my

9    question.

10             THE WITNESS:  Okay.

11             HEARING OFFICER BUTLER-TRUESDALE:

12   I'm not sure.

13             THE WITNESS:  No.  No, I don't

14   think she should be in a self-contained

15   classroom all day.

16             HEARING OFFICER BUTLER-TRUESDALE:

17   No, no, no.  That's not my question.  My

18   question was:  were you expecting that they

19   would do some type of transitioning, a

20   smooth transition with her from being in a

21   general education setting where she was

22   moving around to transition her in phases to

1    a self-contained classroom?  Is that what

2    you were expected?

3              Because it sounds like you want

4    the benefits of a self-contained classroom,

5    but you want her to be able to move around.

6              THE WITNESS:  I didn't even want

7    a self-contained classroom at all.

8              HEARING OFFICER BUTLER-TRUESDALE:

9    You didn't want her in a self-contained --

10              THE WITNESS:  No, I did not.

11              HEARING OFFICER BUTLER-TRUESDALE:

12    Okay.

13              THE WITNESS:  No, I did not.

14    What I was told when she came to the school

15    that she was having special ed.

16              HEARING OFFICER BUTLER-TRUESDALE:

17    So you thought she'd be able to go to

18    different classes --

19              THE WITNESS:  Class from the --

20              HEARING OFFICER BUTLER-TRUESDALE:

21    -- and have special education

22    instructions.

1            THE WITNESS:  Right, because,

2    okay, my other daughter was that way.  She

3    graduated last year.  She was at a charter

4    school whereas they pulled her out of the

5    classroom and gave her maybe an hour or two

6    of special ed.

7            HEARING OFFICER BUTLER-TRUESDALE:

8    I see.

9            THE WITNESS:  And then she still

10    had the two teachers in the classroom, too.

11            HEARING OFFICER BUTLER-TRUESDALE:

12    You were looking for what they call pull-out

13    instructions?

14            THE WITNESS:  Yeah, I didn't know

15    what they had.  Like I said, this all hit me

16    at the last minute.  Okay?  When she got

17    tested and when January and March came

18    around, whatever, January and February came

19    around, they had take this child after six

20    months of wasted time and pulled this child

21    out of her class and put her in this one

22    environment and so be it.  You know, come on

1    now.  That's not fair to her.

2                    If they were to test her like I

3    didn't -- like I said --

4                    HEARING OFFICER BUTLER-TRUESDALE:

5    What stress did she experience from the

6    change?

7                    THE WITNESS:  Stress?  She's not

8    even learning nothing.  I wanted to bring

9    her here.  Maybe you could meet with her or

10   get an appointment and meet with her and she

11   could tell you.  They've got good teachers,

12   but the teachers don't have time for her.

13   That's the whole problem.  They're special

14   ed teachers.

15                   HEARING OFFICER BUTLER-TRUESDALE:

16   Because I'm a little bit confused, and

17   counsel may have to clarify this for me.

18   Where is she now?  I know that we changed

19   the IAP.  You said you were concerned about

20   her being in special education setting all

21   day long.

22                   THE WITNESS:  She don't want to

1    be there.

2              HEARING OFFICER BUTLER-TRUESDALE:

3    Okay.  So now she is what?  Where is she

4    now?

5              MR. BUSH:  I think she's

6    following this scheduling.

7              HEARING OFFICER BUTLER-TRUESDALE:

8    Okay.  Can I see that?

9              MR. HOUSTON:  That's Document No.

10   12.

11             MR. BUSH:  Number 12?  This is

12   the schedule that I passed out for the

13   mother.

14             HEARING OFFICER BUTLER-TRUESDALE:

15   Okay, and are these classes special

16   education classes?

17             MR. BUSH:  Well, what the Options

18   did is they take special ed., slash, regular

19   ed. class from day one because there's two

20   teachers in there so it's a co-teaching

21   class.  So some of them are co-teaching and

22   some of them are self-contained.

 1              HEARING OFFICER BUTLER-TRUESDALE:

 2      I see.  I see.  And you've still got

 3      problems to fix.

 4              THE WITNESS:  Because like I

 5      said, I'm going to go back they can say what

 6      they want.  If they wouldn't have ever told

 7      me, I wouldn't even put her in the school

 8      because I was going to make aware of my

 9      other daughter is going to the other charter

10      school, that the special ed. teachers that

11      was in there was supposed to have been

12      teaching your child.  I didn't know that her

13      testing was below the level until after

14      September, October, November.

15              HEARING OFFICER BUTLER-TRUESDALE:

16      See, I'm going back to this.  I can't make a

17      finding of fact that this school should have

18      done any additional testing without first

19      identifying why they should have suspected

20      that  more tests were needed.

21              So what I'm trying to figure out

22      is what behaviors she would have been

1    demonstrating there at the school that would

2    have put the school on notice that she

3    needed more than the psycho-ed.  That is the

4    central legal question.

5                    THE WITNESS:  My daughter barely

6    be in the classrooms.  That's what behavior

7    is.  My daughter in the hallway.  My

8    daughter in what you call it, Mr. Samuels'

9    most of the time.

10                   HEARING OFFICER BUTLER-TRUESDALE:

11   Okay.

12                   THE WITNESS:  The teachers put

13   her out the classroom because she's not

14   doing her work.  That's what's going on

15   every day.

16                   HEARING OFFICER BUTLER-TRUESDALE:

17   And so you would think that those incidences

18   alone would mean that she needs what

19   evaluation?  Do you know?

20                   THE WITNESS:  Whatever it going

21   to take to get her into her class to sit

22   down and do her work, whatever it going to

```
 1      take because my daughter right now and if

 2      you go up there right now, she probably

 3      ain't in her classroom.  She probably in Mr.

 4      Sam's classroom or standing in the hallway,

 5      maybe do a little bit of something to get

 6      her by to keep the teachers from how you

 7      say, ducking down.  She's not doing

 8      anything.

 9                  HEARING OFFICER BUTLER-TRUESDALE:

10      Okay.

11                  THE WITNESS:  She's not learning

12      anything up there.

13                  HEARING OFFICER BUTLER-TRUESDALE:

14      Okay.

15                  MS. TOWNS:  Madam Hearing

16      Officer, may I state that parent came to --

17      parent sought advocacy based on her concerns

18      that there were problems with the IAP,

19      problems with the placement.  We in our best

20      professional judgment determined, based on

21      our communication with her, as to what a

22      full battery of tests looked like unless
```

1      there was a reason that they're not getting

2      that, such that a parent is perhaps not

3      sophisticated enough to know --

4                    HEARING OFFICER BUTLER-TRUESDALE:

5      But I think from what you just stated, I

6      think that you may have the rule of law in

7      inverse.  I don't think that they're

8      required to give all tests as a rule-out.

9                    MS. TOWNS:  No, no.  Parent was

10     relying on the school to determine -- when

11     she asked for comprehensive testing, she

12     then relies on the school to use their

13     indicators to determine what evals. would be

14     appropriate.  Surely one test would not be

15     enough for them to make --

16                    HEARING OFFICER BUTLER-TRUESDALE:

17     You're making a leap there.

18                    MS. TOWNS:  Yes, but --

19                    HEARING OFFICER BUTLER-TRUESDALE:

20     You're making a leap there, and I'm not

21     going -- I have to stop you so that you know

22     or that we can at least resolve that I think

1    is -- I'm sorry.  We're making a tape here,

2    and the transcriber in the event that you

3    need to go to court if you don't like my

4    ruling, the transcriber needs to hear what I

5    have said.

6              THE WITNESS:  Okay.

7              HEARING OFFICER BUTLER-TRUESDALE:

8        -- that would be objectionable to you.

9    So if you're talking, the mic is recording

10   both you and me and the transcriber cannot

11   give you a transcript of what I'm saying.

12             THE WITNESS:  Okay.

13             HEARING OFFICER BUTLER-TRUESDALE:

14   Okay?

15             THE WITNESS:  All right.

16             HEARING OFFICER BUTLER-TRUESDALE:

17   Now, in terms of the comprehensive -- and

18   this is where I think we are getting

19   confused.  I don't know that the statement

20   testing in all areas of suspected disability

21   equals a petitioner getting comprehensive

22   evaluations.

```
 1                    MS. TOWNS:  Okay.  Well, we --

 2                    HEARING OFFICER BUTLER-TRUESDALE:

 3       Can we agree to that?

 4                    MS. TOWNS:  Yes.

 5                    HEARING OFFICER BUTLER-TRUESDALE:

 6       Okay.

 7                    MS. TOWNS:  Okay.  I wouldn't say

 8       that comprehensive is the same eval. for all

 9       students, no.

10                    HEARING OFFICER BUTLER-TRUESDALE:

11       Okay.

12                    MS. TOWNS:  I think it has to be

13       student specific.  So what would have been -

14       -

15                    HEARING OFFICER BUTLER-TRUESDALE:

16       Comprehensive for ██████████

17                    MS. TOWNS:  Well, even with what

18       we have seen for the meetings, even with the

19       conflict between the mom and the dad and the

20       school constantly calling the mom to the

21       school but let us know that a social history

22       needs to be done so that we can understand
```

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433            WASHINGTON, D.C. 20005-3701            www.nealrgross.com

1    what is the relationship between home and

2    school and is there any indication of that

3    impact on the academic performance.

4                HEARING OFFICER BUTLER-TRUESDALE:

5    So you think that an additional -- you think

6    that there should have been a social

7    history.

8                MS. TOWNS:  Yes.

9                HEARING OFFICER BUTLER-TRUESDALE:

10   And what would have put the school on notice

11   when she asked for the evaluations --

12               MS. TOWNS:  right.

13               HEARING OFFICER BUTLER-TRUESDALE:

14       -- and a social history was needed?

15               MS. TOWNS:  Yes.  Well, surely --

16               HEARING OFFICER BUTLER-TRUESDALE:

17   Because now much of what you just explained

18   to me, the school would have become aware of

19   in the middle of the process of this.

20               MS. TOWNS:  No, no.

21               HEARING OFFICER BUTLER-TRUESDALE:

22   They would not have known that these two

```
 1 │    would not agree when she first walked in to
 2 │    ask for the evaluation, would they?
 3 │             MS. TOWNS:  Yes, but in the fall
 4 │    when the school is constantly calling Mom to
 5 │    come to school for ███████ to come to the
 6 │    school, that gives them some indication that
 7 │    there are problems here that need to be
 8 │    addressed that --
 9 │             HEARING OFFICER BUTLER-TRUESDALE:
10 │    So every child -- let me make sure I
11 │    understand -- every child who the schools
12 │    have to call the home repeatedly to have
13 │    them to report whatever or to have them come
14 │    get them, whatever it is they're calling
15 │    them about, should automatically receive a
16 │    social history?
17 │             MS. TOWNS:  Well, I would
18 │    actually say yes and qualify that.  I would
19 │    say that when we have a 13 year old child
20 │    who has had an educational experience for
21 │    years, that the parent is now saying, "I'd
22 │    like my child evaluated," the parent is
```

1    relying on the school to determine what

2    evals are necessary in order for us to get a

3    comprehensive look at what would be

4    appropriate for this --

5              HEARING OFFICER BUTLER-TRUESDALE:

6    I don't mean to cut you off, but in all

7    areas of suspected disability means

8    disabilities that they're displaying at the

9    school.

10              MS. TOWNS:  Yes.

11              HEARING OFFICER BUTLER-TRUESDALE:

12    Okay.

13              MS. TOWNS:  Well, she is

14    displaying social-emotional issues at the

15    school.

16              THE WITNESS:  Yes.

17              HEARING OFFICER BUTLER-TRUESDALE:

18    Okay.

19              MS. TOWNS:  And a social history

20    would be needed to support that.

21              HEARING OFFICER BUTLER-TRUESDALE:

22    What social-emotional triggers is she

1     displaying at the school?

2              THE WITNESS:  Anger.

3              MS. TOWNS:  Well, the father

4     indicated that his concern was anger

5     management, that she has anger that needs to

6     be dealt with in the sense that it may be

7     interfering with her academics.

8              In our professional judgment, we

9     also ask for a clinical.  I mean, it's not

10    that the school did not recognize that she

11    has some social-emotional issues because

12    you, in fact, put on her IAP psychological

13    counseling with social-emotional goals, but

14    I would say that when the parent came to us,

15    she brought us her records.  We requested

16    records.  She brought us the records that

17    she had, and it was on the basis of our

18    looking at those records that we made the

19    recommendation to the parent as to what

20    evaluations were needed in order to make a

21    full assessment of --

22              HEARING OFFICER BUTLER-TRUESDALE:

1    So now, does parent disagree with the

2    psycho-educational?

3                    MS. TOWNS:  No, the parent -- no,

4    to my knowledge, the parent does not

5    disagree with the psychological.  The parent

6    feels that more comprehensive testing needs

7    to be done.

8                    HEARING OFFICER BUTLER-TRUESDALE:

9    The psychological does not recommend more

10    comprehensive testing.  So does the parent

11    or -- excuse me -- further evaluation.  So

12    does the parent disagree with the psycho-

13    educational?

14                    THE WITNESS:  Up to a certain

15    degree.

16                    HEARING OFFICER BUTLER-TRUESDALE:

17    I'm not going --

18                    THE WITNESS:  I won't disagree

19    with it.

20                    HEARING OFFICER BUTLER-TRUESDALE:

21    I want yes or no.

22                    THE WITNESS:  Yes, I disagree

1    with it.

2              HEARING OFFICER BUTLER-TRUESDALE:

3    Very good.  You disagree with the psycho-

4    educational?

5              THE WITNESS:  Yes, yes.

6              HEARING OFFICER BUTLER-TRUESDALE:

7    Okay.

8              THE WITNESS:  Can I state while?

9              HEARING OFFICER BUTLER-TRUESDALE:

10    Sure.

11             THE WITNESS:  Because if you meet

12    my daughter, she's 13 years old.  She's very

13    intelligent.  She knows how to do arts.  She

14    know how to get on the Internet.  She know

15    how to do a lot of things.  She's very --

16    she's very nice if you meet her, even though

17    Ashley acts out, and for them to test her

18    and act like she's got a mind of a three

19    year old, I'm not with that one because I'm

20    kind of pulled to see even though she might

21    do work or math like a three year old, but

22    she's highly intelligent for a 13 year old.

1    She'll be 14 coming August.

2              She's still in the seventh grade.

3    I came -- like I said, I came to them and

4    thinking that I was going to get some help

5    because the other school had fired everybody

6    in there, which I was trying to do the same

7    thing.  It was like deja vu all over, but

8    this principal fired everybody in the school

9    and then ask me to bring her back, and I

10   refused, and that's when I came to them.

11             The lady even said, Ms. Howe,

12   asking me to hold comprehension testing.  I

13   was with it.  I'm frustrated every day

14   because you think I want to see my daughter

15   -- it's nothing that I want the school

16   system (unintelligible) some help.  Me and

17   her, me and him as parents, we're there when

18   they call us.  He's come to the PTA meeting.

19   He takes her to COMAR on Saturday.  We're

20   being the parent.  I do everything I can.

21             So I'm trying to say, well,

22   something is going on.  Maybe something I

1   can't provide for her.  Can the school see

2   it in the classroom?

3               HEARING OFFICER BUTLER-TRUESDALE:

4   I want to speak with the attorneys for a

5   minute.

6               THE WITNESS:  I'm frustrated.

7               HEARING OFFICER BUTLER-TRUESDALE:

8   Do you want to leave the room?

9               (Whereupon, the foregoing matter

10              went off the record at 11:11 a.m.

11              and went back on the record at

12              11:35 a.m.)

13              HEARING OFFICER BUTLER-TRUESDALE:

14  Cindy Higginbotham, would you raise your

15  right hand, please?

16              MS. HIGGINBOTHAM:  Yes.

17  Whereupon,

18              LaTANYA HIGGINBOTHAM

19  was called as a witness by counsel for the

20  Parent and, having been first duly sworn,

21  was examined and testified as follows:

22              HEARING OFFICER BUTLER-TRUESDALE:

```
 1   Okay.  Your witness, Ms. Towns.
 2                DIRECT EXAMINATION
 3             BY MS. TOWNS:
 4        Q    Ms. Higginbotham, I'd like to ask
 5   you a few questions about your process of
 6   working with Options on the basis in
 7   representation of this parent.  May I refer
 8   you to the IAP, which is AH -- our AH-04?
 9        A    Okay.
10        Q    If you don't have it, it's hear.
11             Did you review the IAP on behalf
12   of this panel?
13        A    Yes, I did.
14        Q    And did you find this IAP to be
15   appropriate?
16        A    No, I did not.
17             MR. HOUSTON:  I object.  There's
18   been no foundation laid to her ability to
19   make that comment.
20             HEARING OFFICER BUTLER-TRUESDALE:
21   Okay.  Lay a foundation for your witness,
22   Ms. Towns.
```

1           BY MS. TOWNS:

2           Q    Ms. Higginbotham, would you state

3     for the record how you came to know Ms.

4     Howe?

5           A    Ms. Howe came to our organization

6     in February.  I believe it was the 24th of

7     February of '06, with some concerns

8     pertaining to ████████ academic program and

9     concerns pertaining to some behavioral

10    issues that she was experiencing at Options

11    Public Charter School.

12          HEARING OFFICER BUTLER-TRUESDALE:

13    Okay.  How the foundation I was looking for

14    was her ability or expertise --

15          MS. TOWNS:  Okay.  That's what I

16    was going to get.

17          HEARING OFFICER BUTLER-TRUESDALE:

18    Okay.

19          MS. TOWNS:  That's what I was

20    going to get.

21          BY MS. TOWNS:

22          Q    Ms. Higginbotham, how long --

1    would you give us some information about

2    your background in terms of special

3    education representation?

4        A    Okay.  My experience in terms of

5    educational advocacy, I have completed a

6    teaching certification program.  I've been

7    an educational advocate for over five years.

8    I've attended various special educational

9    workshops on advocating.  I have a Master's

10   degree in telecommunications information

11   systems and a bachelor's degree in public

12   administration.

13       Q    And how long have you been

14   serving as an advocate?

15       A    Over five years.

16       Q    And in that role have you been

17   representing parents in various situations?

18       A    Yes.

19       Q    How many IAP meetings have you

20   attended?  You can't count?

21       A    Hundreds.

22       Q    Yeah, okay.  Okay.  Let me then

1    refer you to the IAP for this student.

2                    MR. HOUSTON:  There's been no

3    foundation laid what she's going to be

4    testifying to.  She just went through a

5    chronology of what she's done in the past,

6    but she hasn't qualified her as an expert or

7    a fact expert or whatever.  I'm not sure

8    what she's going to be testifying to.

9                    MS. TOWNS:  She is as an

10   advocate.  Ms. Higginbotham is testifying to

11   the adequacy of this IAP.

12                   HEARING OFFICER BUTLER-TRUESDALE:

13   Okay.  Now, what formal or informal -- and

14   you can start with education, if you like --

15   qualifications does she have to determine

16   the adequacy of an IAP?

17                   MS. TOWNS:  She has had extensive

18   experience representing parents with respect

19   to special education, and she has been, as

20   she stated for the record, that she has had

21   training --

22                   HEARING OFFICER BUTLER-TRUESDALE:

1  Training?

2          MS. TOWNS:  -- as it relates to

3  special education.

4          HEARING OFFICER BUTLER-TRUESDALE:

5  Okay.  Can you give me some details about

6  that training?

7          MS. TOWNS:  Okay.  Well, I know

8  that she has -- well, you can talk for

9  yourself, but I know that she has --

10         HEARING OFFICER BUTLER-TRUESDALE:

11  She would have to do that.

12         MS. TOWNS:  Okay.  Go on.

13         THE WITNESS:  I've attended

14  Rights Law's seminars, workshops where they

15  went over IAPs in detail and how to advocate

16  on behalf of parents and students.

17         I've attended workshops through

18  the No Child Left Behind organization,

19  various other organizations who put on

20  teleconference and different conferences and

21  seminars dealing with advocating on behalf

22  of students with special needs.

1              If there's something specific.

2              BY MS. TOWNS:

3         Q    Have you had specific training

4    through Rights Law on IAP development?

5         A    Yes, I have.  They went page by

6    page of the IAP, you  know, who the

7    participant should be, how the IAP should be

8    developed, how the goals should be

9    developed, the type of things that you want

10   to incorporate into the IAP, the evaluation

11   process, how to review the evaluations for

12   pertinent data, how to interpret that data.

13        Q    Okay.  So now these seminars,

14   they were hosted by whom and did they

15   provide any certification or anything like

16   that?

17        A    I did get credit.  They call them

18   CEUs, and I can't remember what --

19              MR. HOUSTON:  Continuing

20   education.

21              THE WITNESS:  Continuing

22   education units.

1              MR. HOUSTON:  Are you done with

2       your voir dire?

3              In what areas are you qualifying

4       her as?  I'm sorry.

5              MS. TOWNS:  I'm qualifying her in

6       order to speak on the adequacy of this IAP.

7              MR. HOUSTON:  Okay.  Do you have

8       a --

9              HEARING OFFICER BUTLER-TRUESDALE:

10      Are you finished, Ms. Towns?

11             MS. TOWNS:  Huh?

12             HEARING OFFICER BUTLER-TRUESDALE:

13      Were you finished?

14             MS. TOWNS:  Un-huh.

15             HEARING OFFICER BUTLER-TRUESDALE:

16      Okay.  Mr. Houston.

17             VOIR DIRE EXAMINATION

18             BY MR. HOUSTON:

19        Q    Do you have a teaching degree?

20        A    I completed a teaching

21      certification program at Trinity.

22        Q    Okay, but that's not a teaching -

1    - you didn't go to a college and get a B.A.

2    in teaching?

3         Q    A four-year program.

4         -    Okay.  Have you ever taught any

5    special needs children?

6         A    No, I haven't.

7         Q    Have you ever drafted an IAP for

8    a school system?

9         A    No, I haven't.

10        Q    Okay.  Have you ever tested any

11   children?

12        A    I've done a -- what do they call

13   it? -- I've participated in a study which

14   involves some preliminary testing.

15        Q    Have you ever done Woodcock-

16   Johnson testing?

17        A    Yes.

18        Q    You've actually given the

19   Woodcock-Johnson?

20        A    Yes, through a pilot program.

21        Q    Have you ever done a WIAT?

22        A    No, I haven't.

1          Q     Have you ever done a WISC?

2          A     No.

3          Q     Have you ever done a Biery?

4          A     No, I haven't.

5          Q     Have you ever done any clinical

6     interviews?

7          A     No, I haven't.

8          Q     Have you ever -- let's see what

9     else Dr. Cranford did.

10              MS. TOWNS:  This witness is not

11     testifying to the adequacy of the psycho-ed.

12     She's testifying to the IAP.

13              MR. HOUSTON:  The reason I'm

14     going through this is this IAP is based upon

15     the psycho-educational.  If she is not

16     qualified to interpret this, there is no way

17     she can talk about the adequacy.

18              HEARING OFFICER BUTLER-TRUESDALE:

19     Is that an objection?  Was that an objection

20     that you were raising?

21              MS. TOWNS:  Yes.

22              HEARING OFFICER BUTLER-TRUESDALE:

1   Go ahead.

2            MR. HOUSTON:  If she does not

3   know the ins and outs of this testing and

4   how to give the test or read it and

5   interpret it, she cannot, since the IAP is

6   based upon this and other things that she

7   was not a part of, she cannot give an

8   informed opinion of if this IAP is

9   appropriate.

10           HEARING OFFICER BUTLER-TRUESDALE:

11  Objection overruled.

12           BY MR. HOUSTON:

13      Q    Have you ever given a Conors

14  rating scales?

15      A    No, I haven't.

16           MR. HOUSTON:  Okay.  At this time

17  I would object to any opinion testimony from

18  Ms. Higginbotham.

19           HEARING OFFICER BUTLER-TRUESDALE:

20  Ms. Towns, do you have a response to his

21  objection?

22           MS. TOWNS:  Yes.  Ms.

1    Higginbotham has indicated the extent of her

2    experience and training as it relates to IAP

3    development, and I think that her training

4    certainly qualifies her to speak to the

5    advocacy of the -- not of specific

6    evaluations, but up to the IDEA requirements

7    for IAPs, and that's what she would speak

8    to, the requirements for IAPs, not the

9    specific evaluations on which the IAP was

10   based.

11        HEARING OFFICER BUTLER-TRUESDALE:

12   Okay.  Now, if I accept her testimony on

13   that limited basis, again, I think I'm

14   holding -- I am narrowing in on the voir

15   dire process.  What exact seminars, what

16   exact training has she had to do that?

17        MS. TOWNS:  It's based on her

18   years of experience and training primarily

19   with extensive training with Westlaw

20   training on the special ed process, which

21   includes --

22        HEARING OFFICER BUTLER-TRUESDALE:

1    With Westlaw?

2                MS. TOWNS:  I'm sorry.  Not

3    Westlaw.  Rights Law.  That includes

4    primarily a focus, a general --

5                HEARING OFFICER BUTLER-TRUESDALE:

6    By qualifying her based on her independent

7    study of Rights Law or a seminar that she

8    went to with Rights Law, on Rights law?

9                MS. TOWNS:  Training, training.

10               HEARING OFFICER BUTLER-TRUESDALE:

11   Training through Rights Law.

12               MS. TOWNS:  Rights Law.

13               HEARING OFFICER BUTLER-TRUESDALE:

14   Okay.  When and where?

15               MS. TOWNS:  Rights Law training.

16               HEARING OFFICER BUTLER-TRUESDALE:

17   When and where?

18               MS. TOWNS:  Okay.

19               THE WITNESS:  I've been to two

20   Rights Law.

21               MS. TOWNS:  Okay. Perhaps, I

22   mean, if this is a problem because I'm sure

1    she's not prepared to give dates and all of

2    the other information, we will testify to

3    her actual experience.

4                    HEARING OFFICER BUTLER-TRUESDALE:

5    Is her actual resume or vita in your

6    disclosure?

7                    MS. TOWNS:  No.

8                    HEARING OFFICER BUTLER-TRUESDALE:

9    I thought I saw that.

10                   What do you want to do?

11                   MS. TOWNS:  We will testify to

12   her participation with the parent at the

13   resolution meeting.

14                   HEARING OFFICER BUTLER-TRUESDALE:

15   Okay.  Do you have any objection to that?

16                   MR. HOUSTON:  I do because the

17   resolution meeting is a result of the

18   hearing request, which was March 13th.

19   Anything that happened subsequent to it has

20   no bearing on the facts, the allegations of

21   the March 13th.

22                   Now, if there are certain --

```
 1              HEARING OFFICER BUTLER-TRUESDALE:

 2    Do you have a response to that?

 3              MS. TOWNS:   What she would

 4    testify to would be her actual participation

 5    which is since there was a filing of the

 6    hearing request, and she certainly as a

 7    representative of the parent at those

 8    meetings would be able to testify to her

 9    participation in that meeting.

10              HEARING OFFICER BUTLER-TRUESDALE:

11    Okay.  Now, with respect to the hearing

12    request, the issues that we are actually

13    adjudicating, what bearing would any

14    testimony from her have on the five issues

15    that were --

16              MS. TOWNS:   Yeah, well, it's

17    mainly the issue of number one where we are

18    alleging that Options failed to evaluate

19    ██████     in every area of suspected disability

20    prior to making a determination of the

21    appropriate disability code and disability -

22    -
```

1           HEARING OFFICER BUTLER-TRUESDALE:

2     Okay.  Now, this is something that happened

3     before the resolution meeting.  So --

4           MS. TOWNS:  Well, but the

5     resolution meeting is relevant in that in

6     that meeting that issue was discussed, which

7     is what the resolution meeting is supposed

8     to be designed to do, to discuss and see if

9     there could be some resolution of the

10    issues.

11          HEARING OFFICER BUTLER-TRUESDALE:

12    Okay, okay.

13          MS. TOWNS:  This -- this --

14          HEARING OFFICER BUTLER-TRUESDALE:

15    So now, she would be testifying to me with

16    respect to her participation in the

17    resolution meeting.

18          MS. TOWNS:  Yes.

19          HEARING OFFICER BUTLER-TRUESDALE:

20    Okay, and a discussion that was had in the

21    resolution meeting about?

22          MS. TOWNS:  That related to that

 1   first issue in the complaint, which is

 2   regarding evaluations.

 3            HEARING OFFICER BUTLER-TRUESDALE:

 4   Okay.  Now, Mr. Houston, any objection to

 5   that?

 6            MR. HOUSTON:  I have an objection

 7   to that because at first we were talking

 8   about voir diring her for educational

 9   advocacy and talking about the

10   appropriateness of that IAP.  Now she's

11   changing it to the appropriateness of all

12   the testing or what we should have tested.

13            I have not voir dired her on

14   whether she's a speech language pathologist,

15   an OT therapist, a clinical psychologist, if

16   she can do any of those things, to be able

17   to ferret out whether those testings were

18   actually needed for this child, and --

19            HEARING OFFICER BUTLER-TRUESDALE:

20   Okay.  It sounds like now you're offering

21   her as a witness as to the conversation that

22   was had at the resolution meeting, not

1    specifically whether or not the evaluations

2    are warranted, but a conversation that was

3    had at that meeting.

4                  MS. TOWNS:  Yes.

5                  HEARING OFFICER BUTLER-TRUESDALE:

6    Is that correct?

7                  MS. TOWNS:  Right.

8                  HEARING OFFICER BUTLER-TRUESDALE:

9    What is your objection to that?

10                  MR. HOUSTON:  The conversation at

11    the meeting?

12                  HEARING OFFICER BUTLER-TRUESDALE:

13    Un-huh.

14                  MR. HOUSTON:  I'm not sure what

15    the conversation was.  If she's talking

16    about what occurred at the resolution

17    meeting, she can certainly testify as a fact

18    witness.  She was there.  But it has no

19    relevance on the underlying legal issues

20    that precipitated this action because she

21    was not participating prior to that March

22    13th.

1           MS. TOWNS:  She's a

2     representative of the parent, and once we

3     were retained to come on as the parent's

4     representative then at any meeting or

5     conversation that was relative to the issues

6     that were contained in our hearing request,

7     then she can testify to if she was actually

8     involved in those discussions.

9           MR. HOUSTON:  I'm not objecting

10    to her being at the resolution meeting.  I'm

11    not objecting to her speaking on behalf of

12    the parent.  What I am objecting to is her

13    providing testimony about things that

14    occurred prior to the March 13th, 2006

15    because we have to stop the date of the

16    hearing.  I mean, the legal issues stop on

17    that date.  If she's trying to amend her

18    complaint, then she has to go through the

19    amendment complaint, which I am not

20    approving at this time, which means that if

21    you're going to amend your complaint to say

22    that there's something occurred at that

1    resolution meeting, then there has to be an

2    amended complaint.

3              MS. TOWNS:  No, no.  No.  The

4    resolution meeting speaks for itself.

5              HEARING OFFICER BUTLER-TRUESDALE:

6    Let's not get off on that.

7              MS. TOWNS:  Okay.

8              HEARING OFFICER BUTLER-TRUESDALE:

9    You are offering her as a witness to me to

10   attest to what she witnessed during a

11   conversation at the resolution meeting,

12   correct?

13             MS. TOWNS:  Yes.

14             HEARING OFFICER BUTLER-TRUESDALE:

15   Okay.

16             MS. TOWNS:  Or to the facts, to

17   put on the record the facts based on her

18   presence at the resolution meeting that are

19   relevant to our issue regarding Option's

20   failure to evaluate in all areas of

21   suspected disability.

22             HEARING OFFICER BUTLER-TRUESDALE:

1    Okay.  Now, my question is:  how is it that

2    -- what at the resolution meeting would be

3    in any way tangent upon the issues presented

4    at the hearing request?

5                MS. TOWNS:  Well, at the

6    resolution meeting or in the hearing request

7    we indicated that evaluations were needed.

8    That issue was then discussed at the

9    resolution meeting, and Ms. Higginbotham

10   would add testimony, her actual testimony,

11   as to what happened at that meeting

12   regarding these tests that were requested.

13               HEARING OFFICER BUTLER-TRUESDALE:

14   Okay.  Any objection to that?

15               MR. HOUSTON:  I have no objection

16   to a factual recantation of what happened.

17               HEARING OFFICER BUTLER-TRUESDALE:

18   Okay.

19               MR. HOUSTON:  She was there.

20               HEARING OFFICER BUTLER-TRUESDALE:

21   Would you limit your testimony to that,

22   please?  Limit your questioning and

1    testimony to that.

2                    MS. TOWNS:  Yes.

3                    BY MS. TOWNS:

4           Q    Ms. Higginbotham, did you attend

5    the resolution session concerning this case?

6           A    Yes, I did.

7           Q    Okay.  That was on 3/27/06?

8           A    Yes.

9           Q    Okay.  At that meeting I believe

10   that the main concern that you addressed was

11   the testing --

12                   MR. HOUSTON:  I object.

13                   BY MS. TOWNS:

14          Q    -- that needed to be done.

15                   MR. HOUSTON:  I object.  She's

16   leading her witness.

17                   BY MS. TOWNS:

18          Q    At that resolution meeting, what

19   was your major concern there?

20          A    The purpose of the meeting was to

21   discuss the complaint that was submitted on

22   behalf of the parent, the issues of the

175

1   complaint.

2                     Should I get into each one of

3   these?

4                     The issue of the appropriateness

5   of the disability code and the special

6   education eligibility and whether or not the

7   student was denied eight.

8                     MR. HOUSTON:   I'm sorry.   I

9   object right now.

10                     BY MS. TOWNS:

11        Q    Was that discussed at the

12   meeting?

13        A    Yes.

14                     MR. HOUSTON:   The witness is

15   reading something right now.   Can I see what

16   --

17                     THE WITNESS:   I'm reading the --

18                     MS. TOWNS:   She's recollecting.

19                     MR. HOUSTON:   No.   There's

20   handwritten notes there that you're reading.

21                     THE WITNESS:   I'm not reading

22   that.

1          MR. HOUSTON:  Yes, ma'am, you

2     were.

3          THE WITNESS:  I wasn't.

4          MS. TOWNS:  Please.

5          THE WITNESS:  I wasn't reading

6     that.  I was going down my list here.

7          MS. TOWNS:  You should have to

8     show him --

9          MR. HOUSTON:  I'm sorry.  You

10    couldn't have been going down that when this

11    was covering that document.

12         THE WITNESS:  No.

13         MS. TOWNS:  You should have --

14         HEARING OFFICER BUTLER-TRUESDALE:

15    Okay.  Listen.  Let's go forward.

16         MS. TOWNS:  Oh, my God.

17         HEARING OFFICER BUTLER-TRUESDALE:

18    Can you give that back to her and --

19         THE WITNESS:  What on there was I

20    just reading off of there?

21         HEARING OFFICER BUTLER-TRUESDALE:

22    -- can you please put that away in your

1    folder?

2              Yes, ma'am.

3              MS. HOWE:  You know, this is very

4    frustrating.

5              HEARING OFFICER BUTLER-TRUESDALE:

6    I understand.

7              MS. HOWE:  Coming to something

8    like this.  I ain't never seen nothing like

9    this in my life.

10             HEARING OFFICER BUTLER-TRUESDALE:

11   I understand, ma'am.

12             MS. HOWE:  And all I wanted is my

13   daughter to be tested so I could go on with

14   my life and she can get some appropriate

15   schooling, things that schools should be

16   providing for these kids.

17             HEARING OFFICER BUTLER-TRUESDALE:

18   Let me say this.

19             MS. HOWE:  That's what I'm

20   frustrated.

21             HEARING OFFICER BUTLER-TRUESDALE:

22   Save us some time because I'd like to go

```
 1      write some decisions.  It is not my fault

 2      that this has become a very adversarial

 3      process.  I do the very best that I can --

 4                 MS. HOWE:  Oh, I'm not --

 5                 HEARING OFFICER BUTLER-TRUESDALE:

 6      Hold on a second, hold on a second.

 7                 -- to remind counsel that parents

 8      do not expect to see this when they come.

 9      When it is possible for me to limit the

10      adversarialness of what's called an

11      adjudicative process, I do so.  I cannot

12      always contain it because what is the first

13      tenet of my job is to make sure that they

14      are allowed to make a reasonable legal

15      record that they want to advance for each

16      party, for their respective parties.

17                 So let me make sure that you

18      understand that I have taken time to put

19      myself in your shoes.  Both of these counsel

20      can probably provide you with several

21      examples where I've said, "Listen.  We're

22      not going to put the parent through this,"
```

```
 1    but I have to make a balance between
 2    allowing them to make the record that they
 3    are hired to make for you and he for the
 4    school and also state, do you know what?
 5    The due process rights procedures should not
 6    be this type of experience for the parents
 7    as any other.
 8                   I want to make sure you
 9    understand that I know that this is
10    frustrating.
11              MS. HOWE:  It is because --
12              HEARING OFFICER BUTLER-TRUESDALE:
13    And that is one of the reasons that I had
14    you speak before or give your testimony
15    before Ms. Higginbotham, because I know also
16    that it's very difficult for parents to sit
17    here and listen to people talk about their
18    children and not get exactly what the due
19    process hearing is supposed to be about,
20    your opportunity to be heard.
21              MS. HOWE:  Yes.
22              HEARING OFFICER BUTLER-TRUESDALE:
```

1    Unfortunately it has evolved into a lot more

2    --

3                    MS. HOWE:  Than what it is.

4                    HEARING OFFICER BUTLER-TRUESDALE:

5     -- that what even Congress anticipated it

6     would be when they first gave you your due

7     process rights.

8                    Really, to be honest with you,

9     neither -- look.  None of us are at fault

10    today.

11                    MS. HOWE:  Right.

12                    HEARING OFFICER BUTLER-TRUESDALE:

13    Okay?  I want to make sure you understand

14    that I have not eaten.  It's five minutes to

15    12.  Okay?  I have another hearing at one

16    o'clock.  I'm sitting here for your

17    daughter.

18                    MS. HOWE:  Thank you.

19                    HEARING OFFICER BUTLER-TRUESDALE:

20    Because if this were my child, I would

21    expect someone being paid to hear this for

22    two hours to be professional enough to sit

1      here for four hours even though I haven't

2      eaten and I have other decisions which are

3      due today.  Okay?  For other children.

4                   So what I need to make sure you

5      understand because I've alerted Ms. Towns to

6      this before is that you as a parent must be

7      as patient as I'm willing to be.

8                   MS. HOWE:  No, I've got patients.

9                   HEARING OFFICER BUTLER-TRUESDALE:

10     Okay.

11                  MS. HOWE:  I'm just frustrated.

12                  HEARING OFFICER BUTLER-TRUESDALE:

13     But it's the process.  It's the process.  It

14     is what it is, and we're here to try to make

15     sure that whatever should have been

16     delivered to Ashley, if there's something

17     more that she was supposed to get, that she

18     gets that.

19                  MS. HOWE:  Okay.  But I --

20                  HEARING OFFICER BUTLER-TRUESDALE:

21     I just -- I swear to God, if we were sitting

22     in my living room I'd let you to talk to me

1    for three or four hours about your

2    situation.

3              MS. HOWE:  Thank you.

4              HEARING OFFICER BUTLER-TRUESDALE:

5    I want to keep going because if I'm going to

6    sit here and not eat so that we can resolve

7    Ashley's situation, you just have to put up

8    with it because I am.

9              MS. HOWE:  I've got patience.  I

10   just don't like the idea of the way he

11   disrespected.  He sit here.  He wasn't even

12   in the meeting, and I understand he's

13   representing the school.  It's a difference

14   if he was among like us.

15              HEARING OFFICER BUTLER-TRUESDALE:

16   But if you owned the school, if you were on

17   the board for the school, if you had founded

18   the school, you'd want him to do exactly

19   what he's doing.

20              MS. HOWE:  I've never seen

21   nothing like it.

22              HEARING OFFICER BUTLER-TRUESDALE:

1    You live in the District of Columbia?

2            MS. HOWE:  Yes.

3            HEARING OFFICER BUTLER-TRUESDALE:

4    The District of Columbia sends a certain

5    amount of funds to these charter schools

6    each year for each student that's attending

7    them.  Those funds come out of your federal

8    and your local taxes.  The fiscal cycle of

9    the school depends on how much they spend on

10    special education services.

11            MS. HOWE:  They ain't spending

12    nothing on mine.

13            HEARING OFFICER BUTLER-TRUESDALE:

14    Believe it or not, you're on both sides of

15    the table whether you like it or not.  Okay?

16    It's horrible.  I hate it.  Okay?

17            Go on.

18            BY MS. TOWNS:

19       Q    You indicated that at the

20    resolution meeting it was reviewed, the

21    issues that were in the -- in the --

22       A    Complaint.

```
1           Q      -- in the complaint.  Was there a
2      discussion of the need for or the request or
3      the allegation that there was a need for
4      additional testing?
5           A      Yes.
6           Q      The parent and I were in
7      agreement based on a review of the psycho-
8      educational that we needed to ask Dr.
9      Cranford for some clarification on the
10     psycho-educational.  So we went over that as
11     the team again reviewed the psycho-
12     educational, and I questioned some of the
13     comments that were in there regarding the
14     visual-motor integration.
15               MR. HOUSTON:  I object.  I
16     understand that she's talking about
17     factually related things, but she's making a
18     point that she's not been an expert on.  So
19     regardless of what she had done at that
20     meeting, the fact that she's not an expert
21     on those types of tests, they're trying to
22     back-door that testimony of what she feels
```

1    is inappropriate about this testing without

2    any foundation about her qualifications to

3    say what is inappropriate about this

4    testing.

5                HEARING OFFICER BUTLER-TRUESDALE:

6    This line of questioning is not about the

7    quality of the psycho-ed.  It's about the

8    request for testing.  She's just giving a

9    report on what transpired at the resolution

10   meeting regarding the discussion around

11   testing.

12                Okay.  Proceed.

13                THE WITNESS:  So we discussed --

14   we reviewed the visual-motor integration

15   scores and my question to Dr. Cranford was

16   when a student is functioning four grade

17   levels below where they currently are, if

18   the test results show they are functioning

19   four grade levels below, would that warrant

20   an occupational therapy evaluation, and he

21   basically just said we can do an

22   occupational therapy evaluation.